**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

12 CV 3110

| | | |
|---|---|---|
| CONGETTA J. MARTINO, PHILIP E. RICCIARDI, and PHYLLIS D. RICCIARDI, Derivatively on Behalf of METLIFE, INC., | X : : : | Case No. |
| Plaintiffs, | : : : : | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT |
| v. | : : | |
| STEVEN A. KANDARIAN, ERIC T. STEIGERWALT, WILLIAM J. WHEELER, PETER M. CARLSON, CHERYL W. GRISÉ, HUGH B. PRICE, JOHN M. KEANE, KENTON J. SICCHITANO, SYLVIA MATHEWS BURWELL, JAMES M. KILTS, R. GLENN HUBBARD, DAVID SATCHER, EDUARDO CASTRO-WRIGHT, LULU C. WANG, CATHERINE R. KINNEY, ALFRED F. KELLY, JR., C. ROBERT HENRIKSON, and WILLIAM J. MULLANEY, | : : : : : : : : : : : : : | |
| Defendants, | : : | |
| -and- | : : | |
| METLIFE, INC., a Delaware corporation, | : : : | |
| Nominal Defendant. | : X | DEMAND FOR JURY TRIAL |



## SUMMARY OF THE CASE

1.      This is a verified shareholder derivative action brought by plaintiffs on behalf of nominal defendant MetLife, Inc. ("MetLife" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law.  These wrongs resulted in hundreds of millions of dollars in damages to MetLife's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed the Company to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.      In July 2010, the New York State Attorney General announced that it had begun a major fraud probe into whether the Company and other insurers had routinely, and in violation of relevant law and insurance regulations, retained monies belonging to policyholder beneficiaries in their retained asset accounts (also known as total control accounts or "TCA").  These monies were retained in order to profit from the accumulation and investment of such monies and avoid paying beneficiaries or escheating money to the relevant state authorities.  Some reports contended the insurers, including MetLife, may owe beneficiaries more than $1 billion throughout the United States.  Indeed, MetLife's practices and policies have resulted in over thirty investigations by states.  One of the reasons for these investigations is that under almost every states' law, any monies held or owing by any life insurance corporation are deemed abandoned if they remained unclaimed and unpaid for more than some number of years (e.g., five years) after the monies became due and payable as established from the records of the corporations under any life insurance policy which has matured or terminated.[1]  MetLife has not been escheating these funds to the relevant states as required.

_____

[1] A life insurance policy not matured by actual proof of death of the insured is deemed to be matured and the proceeds payable if such policy was in force when the insured attained the limiting age under the mortality table on which the reserve is based.  Once these funds are deemed abandoned, they are subject to the custody of the state.

3.     In order to determine when a person dies, life insurance companies, including MetLife, use the Social Security Administration's Death Master File ("SSA-DMF"). The SSA-DMF is a government-maintained database of all deaths recorded in the United States, including demographic information about decedents, including, for example, their social security numbers. MetLife has engaged in the use of the SSA-DMF since the 1980s in order to determine whether its annuity policyholders have died so that the Company can immediately stop making annuity payments to deceased policyholders. Separately, however, the Company has also revealed that it did not regularly use the SSA-DMF to determine whether policyholders had died, which would subject the Company to immediate liabilities for benefits to policy beneficiaries, and start the clock for escheatment of unclaimed property or benefit funds to relevant state authorities in the event that beneficiaries were either not located or did not submit a claim to the Company within the statutory period.

4.     While the Individual Defendants (as defined herein) were improperly avoiding paying beneficiaries and failing to escheat funds to the states, the Company continued to report strong financial results, including operating earnings, purportedly based upon strong underwriting and results in insurance products. With respect to whether the Company timely and appropriately paid policyholder beneficiaries and escheated money to the states, the Individual Defendants improperly stated that "[o]ur priority is to pay insurance benefits to those who are entitled to them.... When beneficiaries cannot be located, we turn those benefits over to the state."

5.     In addition, the Company in its financial statements filed with the U.S. Securities & Exchange Commission ("SEC") claimed that allegations of fraud or violations of law related to its retained asset accounts were wholly "without merit" stating that "[m]anagement believes that any allegations that information about the TCA is not adequately disclosed or that the accounts are fraudulent or otherwise violate state or federal laws are *without merit*." This

statement was improper as the Individual Defendants knew, or were reckless in not knowing, that the Company was wrongfully and unfairly using the SSA-DMF to determine whether its annuity policyholders had died so that MetLife could stop making payments, but ignored the SSA-DMF to determine whether death benefit payments were due under life insurance policies.

6.    Once the Individual Defendants could no longer hide their wrongdoing, on August 5, 2011, MetLife filed its Form 10-Q for the period ended June 30, 2011, and disclosed that regulatory investigations into its death benefits practices could result in additional escheatment to states, administrative penalties, and may have a substantial impact on the Company's financial statements. MetLife quantified its related exposure in its Form 8-K filed on October 6, 2011, which stated that the company projected a $115 million to $135 million after-tax charge in connection with its death benefits reserves.

7.    In the wake of the disclosure that MetLife would have to take up to a $135 million writedown to reserve for losses, MetLife's market capitalization plunged more than $17.4 billion, or 36.4%, compared to the its high of $47.9 billion only eight months before the truth about its liabilities was disclosed. Further, as a direct result of this unlawful course of conduct, the Company is now the subject of a federal securities class action lawsuit filed in the United States District Court for the Southern District of New York on behalf of investors who purchased MetLife shares.

## JURISDICTION AND VENUE

8.    Jurisdiction is conferred by 28 U.S.C. §1332. Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the

exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i) MetLife maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to MetLife, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiffs**

11.     Plaintiff Congetta J. Martino was a shareholder of MetLife at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current MetLife shareholder. Plaintiff Congetta J. Martino is a citizen of Pennsylvania.

12.     Plaintiffs Philip E. Ricciardi and Phyllis D. Ricciardi were shareholders of MetLife at the time of the wrongdoing complained of, have continuously been shareholders since that time, and are current MetLife shareholders. Plaintiffs Philip E. Ricciardi and Phyllis D. Ricciardi are citizens of Pennsylvania.

**Nominal Defendant**

13.     Nominal Defendant MetLife is a Delaware corporation with principal executive offices located at 200 Park Avenue, New York, New York. MetLife is a leading global provider of insurance, annuities, and employee benefit programs, serving ninety million customers in more than fifty countries. Through its various subsidiaries and affiliates, MetLife holds leading market positions in the United States, Japan, Latin America, Asia Pacific, Europe, and the

Middle East. In the United States, MetLife provides a variety of insurance and financial services products including life, dental, disability, auto, and homeowners' insurance, guaranteed interest and stable value products, and annuities – through a variety of distribution channels. MetLife is the largest life insurer in terms of life insurance "in-force" in North America, and offers financial products and services to over ninety of the top 100 FORTUNE 500® companies. MetLife's insurance subsidiaries include Metropolitan Life Insurance Company ("MLIC"), the Company's principal asset, American Life Insurance Company, MetLife Insurance Company of Connecticut, Metropolitan Property and Casualty Insurance Company ("MPC"), and Metropolitan Tower Life Insurance Company. MetLife is named in this Complaint as a nominal defendant solely in a derivative capacity, and this shareholder derivative action is on its behalf.

**Defendants**

14.    Defendant Steven A. Kandarian ("Kandarian") is MetLife's Chairman of the Board of Directors (the "Board") and has been since January 2012; President and Chief Executive Officer ("CEO") and has been since May 2011; and a director and has been since April 2011. Kandarian was also Executive Vice President and Chief Investment Officer of MetLife and MLIC from April 2005 to April 2011, during which time he was responsible for MetLife's Investments Department and more than $450 billion general account portfolio. In 2009, Kandarian also assumed responsibility for MetLife's Global Brand and Marketing Services Department and oversaw the development of MetLife's enterprise-wide corporate strategy. Kandarian also served as a director of MetLife Bank, National Association ("MetLife Bank"), MetLife's banking subsidiary. Kandarian knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning the Company's: (i) current liabilities; (ii) the merits of the investigations by state authorities into its retained asset accounts; and (iii) the Company's operating earnings. Moreover, Kandarian utterly failed to maintain inadequate internal controls related to the Company's financial statements and

compliance with applicable laws, rules, and regulations.  MetLife paid Kandarian the following compensation as an executive:

| Fiscal Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| 2010 | $625,000 | $870,480 | $896,000 | $1,500,000 | $197,136 | $69,000 | $4,157,616 |
| 2009 | $583,333 | $1,987,200 | $1,519,200 | $1,100,000 | $173,487 | $77,100 | $5,440,320 |
| 2008 | $531,250 | $840,275 | $771,255 | $1,000,000 | $213,112 | $93,297 | $3,449,189 |

Kandarian is a citizen of New Jersey.

      15.    Defendant Eric T. Steigerwalt ("Steigerwalt") is MetLife's Executive Vice President and Interim Chief Financial Officer ("CFO") and has been since November 2011. Steigerwalt is also an Executive Vice President of MLIC and has been since January 2010. Steigerwalt was a MetLife Senior Vice President from June 2000 to July 2009 and Treasurer from May 2007 to July 2009.  Steigerwalt was also an MLIC Senior Vice President from June 2000 to December 2009 and Vice President from September 1998 to June 2000.  As an officer of MLIC, Steigerwalt served as CFO of its U.S. Business from August 2009 to November 2011; CFO of its Individual Business from 2002 to 2003; and Head of Investor Relations from 2000 to 2002.  Steigerwalt knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning the Company's: (i) current liabilities; (ii) the merits of the investigations by state authorities into its retained asset accounts; and (iii) the Company's operating earnings.  Moreover, Steigerwalt utterly failed to maintain inadequate internal controls related to the Company's financial statements and compliance with applicable laws, rules, and regulations.  Steigerwalt is a citizen of New Jersey.

      16.    Defendant William J. Wheeler ("Wheeler") is MetLife's President, The Americas and has been since November 2011.  Wheeler was also MetLife's Executive Vice President and CFO from December 2003 to November 2011.  Wheeler was a Senior Vice President of MLIC from 1997 to December 2003, and joined MLIC in 1997 as Treasurer.  Wheeler knowingly,

recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning the Company's: (i) current liabilities; (ii) the merits of the investigations by state authorities into its retained asset accounts; and (iii) the Company's operating earnings. Moreover, Wheeler utterly failed to maintain inadequate internal controls related to the Company's financial statements and compliance with applicable laws, rules, and regulations. MetLife paid Wheeler the following compensation as an executive:

| Fiscal Year | Salary | Bonus | Stock Awards | Option Awards | Securities Underlying Options (#) | Non-Equity Incentive Plan Compensation | Change in Pension Value | LTIP Payouts | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 2010 | $627,083 | - | $902,720 | $940,800 | - | $2,000,000 | $337,606 | - | $95,291 | $4,903,500 |
| 2009 | $908,333 | - | $1,987,200 | $1,645,800 | - | $1,300,000 | $277,488 | - | $102,156 | $5,920,977 |
| 2008 | $568,750 | - | $898,255 | $824,445 | - | $1,200,000 | $216,945 | - | $109,647 | $3,818,042 |
| 2007 | $512,500 | - | $1,039,695 | $683,000 | - | $1,800,000 | $189,393 | - | $109,849 | $4,478,437 |
| 2006 | $433,333 | - | $964,901 | $500,367 | - | $1,700,000 | $214,677 | | $96,688 | $3,899,966 |
| 2005 | $395,833 | $1,375,000 | - | - | $35,000 | - | - | $517,981 | $44,821 | $2,533,635 |
| 2004 | $375,000 | $700,000 | - | - | $40,000 | - | - | $210,135 | $27,000 | $1,312,135 |
| 2003 | $349,856 | $300,000 | - | - | $28,500 | - | - | $257,066 | $1,193 | $908,115 |

Wheeler is a citizen of New York.

17.     Defendant Peter M. Carlson ("Carlson") is MetLife's Chief Accounting Officer and has been since May 2009 and Executive Vice President, Finance Operations and has been since at least June 2009. Carlson joined MetLife as an Executive Vice President in April 2009. Carlson knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning the Company's: (i) current liabilities; (ii) the merits of the investigations by state authorities into its retained asset accounts; and (iii) the Company's operating earnings. Moreover, Carlson utterly failed to maintain inadequate internal controls related to the Company's financial statements and compliance with applicable laws, rules, and regulations. Carlson is a citizen of North Carolina.

18.     Defendant Cheryl W. Grisé ("Grisé") is MetLife's Lead Director and has been since February 2010 and a director of MetLife and MLIC and has been since 2004. Grisé is Chairman of MetLife's Governance and Corporate Responsibility Committee and has been since

at least March 2011 and a member of the Audit Committee and has been since at least March 2008. Grisé was also Chairman of MetLife's Governance Committee from at least March 2008 to at least March 2010 and a member of that committee from at least March 2004 to at least March 2010. Grisé was a member of MLIC's Investment Committee from at least March 2008 to at least March 2010. Grisé knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) current liabilities; (ii) the merits of the investigations by state authorities into its retained asset accounts; and (iii) the Company's operating earnings. Moreover, Grisé utterly failed to maintain inadequate internal controls related to the Company's financial statements and compliance with applicable laws, rules, and regulations. MetLife paid Grisé the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2010 | $168,750 | $112,500 | $6,584 | $287,834 |
| 2009 | $137,500 | $112,500 | $6,199 | $256,199 |
| 2008 | $137,500 | $112,500 | $6,066 | $256,066 |
| 2007 | $112,500 | $112,500 | $6,084 | $231,084 |
| 2006 | $112,500 | $112,500 | - | $225,000 |

Grisé is a citizen of Connecticut.

19.    Defendant Hugh B. Price ("Price") is a MetLife director and has been since 1999 and an MLIC director and has been since 1994. Price is also a member of MetLife's Audit Committee and has been since at least April 2000. Price was Chairman of MetLife's Corporate Responsibility and Compliance Committee or its predecessors from at least March 2003 to at least March 2010 and a member of that committee or its predecessors from at least April 2000 to at least March 2010. Price knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) current liabilities; (ii) the merits of the investigations by state authorities into its retained asset accounts; and (iii) the Company's operating earnings. Moreover, Price utterly failed to maintain inadequate internal controls

related to the Company's financial statements and compliance with applicable laws, rules, and regulations.  MetLife paid Price the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2010 | $137,500 | $112,500 | $15,411 | $265,411 |
| 2009 | $137,500 | $112,500 | $15,484 | $265,484 |
| 2008 | $137,500 | $112,500 | $15,316 | $265,316 |
| 2007 | $137,500 | $112,500 | $15,316 | $265,316 |
| 2006 | $137,500 | $112,500 | $10,233 | $260,233 |

Price is a citizen of New York.

20.    Defendant John M. Keane ("Keane") is a director of MetLife and MLIC and has been since 2003.  Keane is also a member of MetLife's Audit Committee and has been since at least March 2004 and a member of the Governance and Corporate Responsibility Committee and has been since at least March 2011.  Keane was a member of MetLife's Governance Committee from at least March 2004 to at least March 2010 and member of the Corporate Responsibility and Compliance Committee from at least March 2009 to at least March 2010.  Keane knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) current liabilities; (ii) the merits of the investigations by state authorities into its retained asset accounts; and (iii) the Company's operating earnings.  Moreover, Keane utterly failed to maintain inadequate internal controls related to the Company's financial statements and compliance with applicable laws, rules, and regulations.  MetLife paid Keane the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2010 | $112,500 | $112,500 | $1,584 | $226,584 |
| 2009 | $132,500 | $112,500 | $1,584 | $246,584 |
| 2008 | $112,500 | $112,500 | $1,584 | $226,584 |
| 2007 | $112,500 | $112,500 | $1,584 | $226,584 |
| 2006 | $112,500 | $112,500 | - | $225,000 |

Keane is a citizen of Virginia.

21.    Defendant Kenton J. Sicchitano ("Sicchitano") is a director of MetLife and MLIC and has been since 2003. Sicchitano is also Chairman of MetLife's Audit Committee and has been since at least March 2009 and a member of that committee and has been since at least March 2004. Sicchitano was a member of MetLife's Finance and Risk Policy Committee from at least March 2008 to at least March 2011 and a member of MLIC's Investment Committee from at least March 2005 to at least March 2010. Sicchitano knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) current liabilities; (ii) the merits of the investigations by state authorities into its retained asset accounts; and (iii) the Company's operating earnings. Moreover, Sicchitano utterly failed to maintain inadequate internal controls related to the Company's financial statements and compliance with applicable laws, rules, and regulations. MetLife paid Sicchitano the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2010 | $137,500 | $112,500 | $4,084 | $254,084 |
| 2009 | $137,500 | $112,500 | $1,584 | $251,584 |
| 2008 | $137,500 | $112,500 | $1,584 | $251,584 |
| 2007 | $112,500 | $112,500 | $1,584 | $226,584 |
| 2006 | $112,500 | $112,500 | - | $225,000 |

Sicchitano is a citizen of Florida.

22.    Defendant Sylvia Mathews Burwell ("Burwell") is a director of MetLife and MLIC and has been since 2004. Burwell is also a member of MetLife's Governance and Corporate Responsibility Committee and has been since at least March 2011. Burwell was a member of MetLife's Finance and Risk Policy Committee from at least March 2008 to at least March 2010; a member of the Corporate Responsibility and Compliance Committee or its predecessors from at least March 2004 to at least March 2010; and a member of the Governance Committee from at least March 2004 to at least March 2010. Burwell was also a member of MLIC's Investment Committee from at least March 2005 to at least March 2007 and again in at

least 2011. Burwell knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) current liabilities; (ii) the merits of the investigations by state authorities into its retained asset accounts; and (iii) the Company's operating earnings. Moreover, Burwell utterly failed to maintain inadequate internal controls related to the Company's financial statements and compliance with applicable laws, rules, and regulations. MetLife paid Burwell the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2010 | $112,500 | $112,500 | $1,584 | $226,584 |
| 2009 | $112,500 | $112,500 | $1,584 | $226,584 |
| 2008 | $112,500 | $112,500 | $1,584 | $226,584 |
| 2007 | $112,500 | $112,500 | $1,584 | $226,584 |
| 2006 | $112,500 | $112,500 | - | $225,000 |

Burwell is a citizen of Washington.

23.    Defendant James M. Kilts ("Kilts") is a director of MetLife and MLIC and has been since 2005. Kilts was also a member of MetLife's Finance and Risk Policy Committee from at least March 2008 to at least March 2010 and a member of the Governance Committee from at least March 2005 to at least March 2010. Kilts was a member of MLIC's Investment Committee in at least 2011. Kilts knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) current liabilities; (ii) the merits of the investigations by state authorities into its retained asset accounts; and (iii) the Company's operating earnings. Moreover, Kilts utterly failed to maintain inadequate internal controls related to the Company's financial statements and compliance with applicable laws, rules, and regulations. MetLife paid Kilts the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2010 | $137,500 | $112,500 | $6,584 | $256,584 |
| 2009 | $137,500 | $112,500 | $1,584 | $251,584 |
| 2008 | $112,500 | $112,500 | $6,584 | $231,584 |
| 2007 | $112,500 | $112,500 | $6,584 | $231,584 |
| 2006 | $112,500 | $112,500 | - | $225,000 |

Kilts is a citizen of Connecticut.

24.     Defendant R. Glenn Hubbard ("Hubbard") is a director of MetLife and MLIC and has been since February 2007. Hubbard was also a member of MetLife's Governance Committee from at least March 2007 to at least March 2010; a member of the Finance and Risk Policy Committee from at least March 2008 to at least March 2011; and Chairman of the Finance and Risk Policy Committee in at least 2009. Hubbard was Chairman of MLIC's Investment Committee from at least March 2010 to at least March 2011 and a member of that committee from at least March 2007 to at least March 2011. Hubbard knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) current liabilities; (ii) the merits of the investigations by state authorities into its retained asset accounts; and (iii) the Company's operating earnings. Moreover, Hubbard utterly failed to maintain inadequate internal controls related to the Company's financial statements and compliance with applicable laws, rules, and regulations. MetLife paid Hubbard the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2010 | $137,500 | $112,500 | $6,584 | $256,584 |
| 2009 | $157,500 | $112,500 | $6,584 | $276,584 |
| 2008 | $137,500 | $112,500 | $1,584 | $251,584 |
| 2007 | $140,625 | $140,625 | $6,452 | $287,702 |

Hubbard is a citizen of New York.

25.     Defendant David Satcher ("Satcher") is a director of MetLife and MLIC and has been since February 2007. Satcher is also a member of MetLife's Governance and Corporate Responsibility Committee and has been since at least March 2011. Satcher was a member of MetLife's Corporate Responsibility and Compliance Committee or its predecessors from at least March 2007 to at least March 2010; a member of the Governance Committee from at least March 2007 to at least March 2010; and a member of MLIC's Investment Committee in at least 2011.

- 12 -

Satcher knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) current liabilities; (ii) the merits of the investigations by state authorities into its retained asset accounts; and (iii) the Company's operating earnings. Moreover, Satcher utterly failed to maintain inadequate internal controls related to the Company's financial statements and compliance with applicable laws, rules, and regulations. MetLife paid Satcher the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2010 | $112,500 | $112,500 | $6,584 | $231,584 |
| 2009 | $112,500 | $112,500 | $1,584 | $226,584 |
| 2008 | $112,500 | $112,500 | $1,584 | $226,584 |
| 2007 | $140,625 | $140,625 | $1,452 | $282,702 |

Satcher is a citizen of Georgia.

26.    Defendant Eduardo Castro-Wright ("Castro-Wright") is a director of MetLife and MLIC and has been since March 2008.    Castro-Wright is also a member of MetLife's Governance and Corporate Responsibility Committee and has been since at least March 2011. Castro-Wright was a member of MetLife's Finance and Risk Policy Committee from at least March 2009 to at least March 2010; a member of the Governance Committee from at least March 2009 to at least March 2010; and a member of MLIC's Investment Committee in at least 2011. Castro-Wright knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) current liabilities; (ii) the merits of the investigations by state authorities into its retained asset accounts; and (iii) the Company's operating earnings.    Moreover, Castro-Wright utterly failed to maintain inadequate internal controls related to the Company's financial statements and compliance with applicable laws, rules, and regulations. MetLife paid Castro-Wright the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2010 | $112,500 | $112,500 | $6,574 | $231,574 |
| 2009 | $112,500 | $112,500 | $6,574 | $231,574 |
| 2008 | $131,250 | $131,250 | $1,320 | $263,820 |

Castro-Wright is a citizen of Nevada.

27.    Defendant Lulu C. Wang ("Wang") is a director of MetLife and MLIC and has been since March 2008.  Wang was also a member of MetLife's Corporate Responsibility and Compliance Committee from at least March 2009 to at least March 2010; a member of the Governance Committee from at least March 2009 to at least March 2010; a member of the Finance and Risk Policy Committee in at least 2011; and a member of MLIC's Investment Committee from at least March 2009 to at least March 2011.  Wang knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) current liabilities; (ii) the merits of the investigations by state authorities into its retained asset accounts; and (iii) the Company's operating earnings.  Moreover, Wang utterly failed to maintain inadequate internal controls related to the Company's financial statements and compliance with applicable laws, rules, and regulations.  MetLife paid Wang the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2010 | $112,500 | $112,500 | $1,584 | $226,584 |
| 2009 | $112,500 | $112,500 | $1,584 | $226,584 |
| 2008 | $131,250 | $131,250 | $1,320 | $263,820 |

Wang is a citizen of New York.

28.    Defendant Catherine R. Kinney ("Kinney") is a director of MetLife and MLIC and has been since April 2009.  Kinney was also a director of MetLife and MLIC from 2002 to 2004.  Kinney is a member of MetLife's Audit Committee and has been since at least March 2010.  Kinney was also a member of MetLife's Finance and Risk Policy Committee in at least 2011; a member of the Corporate Responsibility and Compliance Committee in at least 2010; a member of the Governance Committee or its predecessor from at least March 2002 to at least March 2004; and a member of MLIC's Investment Committee in at least 2010.  Kinney knowingly or recklessly made improper statements in the Company's press releases and public

filings concerning the Company's: (i) current liabilities; (ii) the merits of the investigations by state authorities into its retained asset accounts; and (iii) the Company's operating earnings. Moreover, Kinney utterly failed to maintain inadequate internal controls related to the Company's financial statements and compliance with applicable laws, rules, and regulations. MetLife paid Kinney the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2010 | $112,500 | $112,500 | $6,584 | $231,584 |
| 2009 | $132,500 | $112,500 | $6,188 | $251,188 |

Kinney is a citizen of New York.

29.     Defendant Alfred F. Kelly, Jr. ("Kelly") is a director of MetLife and MLIC and has been since June 2009. Kelly is also a member of MetLife's Audit Committee and has been since at least March 2010. Kelly was Chairman of MetLife's Finance and Risk Policy Committee from at least March 2010 to at least March 2011. Kelly knowingly or recklessly made improper statements in the Company's press releases and public filings concerning the Company's: (i) current liabilities; (ii) the merits of the investigations by state authorities into its retained asset accounts; and (iii) the Company's operating earnings. Moreover, Kelly utterly failed to maintain inadequate internal controls related to the Company's financial statements and compliance with applicable laws, rules, and regulations. MetLife paid Kelly the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2010 | $143,750 | $112,500 | $6,584 | $262,834 |
| 2009 | $93,750 | $93,750 | $924 | $188,424 |

Kelly is a citizen of New York.

30.     Defendant C. Robert Henrikson ("Henrikson") was MetLife and MLIC's Chairman of the Board from April 2006 to January 2012 and President and CEO from March 2006 to May 2011. Henrikson was also MetLife's President and Chief Operating Officer from

June 2004 to March 2006; President of its U.S. Insurance and Financial Services businesses from July 2002 to June 2004; and President of its Institutional Business from September 1999 to July 2002. Henrikson served in various other positions at MetLife and MLIC starting in approximately 1973, including President, Institutional Business; Senior Executive Vice President, Institutional Business; Executive Vice President, Institutional Business; and Senior Vice President, Pensions. Henrikson was also a member of MetLife's Corporate Responsibility and Compliance Committee or its predecessors from at least March 2006 to at least March 2010 and a member of MLIC's Investment Committee from at least March 2007 to at least March 2011. Henrikson knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning the Company's: (i) current liabilities; (ii) the merits of the investigations by state authorities into its retained asset accounts; and (iii) the Company's operating earnings. Moreover, Henrikson utterly failed to maintain inadequate internal controls related to the Company's financial statements and compliance with applicable laws, rules, and regulations. MetLife paid Henrikson the following compensation as an executive:

| Fiscal Year | Salary | Bonus | Stock Awards | Option Awards | Securities Underlying Options (#) | Non-Equity Incentive Plan Compensation | Change in Pension Value | LTIP Payouts | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 2010 | $1,500,000 | - | $3,633,280 | $4,688,600 | - | $4,500,000 | - | - | $348,574 | $13,867,854 |
| 2009 | $1,500,000 | - | $2,898,000 | $2,307,600 | - | $2,500,000 | $1,620,259 | - | $260,483 | $11,600,336 |
| 2008 | $1,000,000 | - | $4,056,600 | $3,723,300 | - | $3,250,000 | $10,243,642 | - | $404,129 | $22,477,471 |
| 2007 | $1,000,000 | - | $4,258,100 | $3,708,000 | - | $5,000,000 | $7,194,274 | - | $297,965 | $21,448,059 |
| 2006 | $900,000 | - | $4,234,687 | $2,217,100 | - | $4,000,000 | $7,246,554 | - | $233,259 | $13,880,670 |
| 2005 | $893,334 | $2,075,000 | - | - | 90,000 | - | - | $1,650,912 | $80,333 | $5,498,579 |
| 2004 | $660,000 | $1,430,000 | - | - | 90,000 | - | - | $1,764,124 | $87,000 | $2,831,126 |
| 2003 | $600,000 | $1,075,000 | - | - | 115,000 | - | - | $972,052 | $68,646 | $2,713,598 |
| 2002 | $566,677 | $1,100,000 | - | - | 140,000 | - | - | $1,186,000 | $117,217 | $3,232,794 |
| 2001 | $525,000 | $825,000 | - | - | 80,600 | - | - | $1,000,000 | $129,605 | $3,275,805 |
| 2000 | $522,500 | $600,000 | - | - | - | - | - | $1,531,000 | $123,928 | $3,477,928 |
| 1999 | $500,000 | $875,000 | - | - | - | - | - | $1,743,000 | $92,543 | $3,210,543 |

Henrikson is a citizen of Connecticut.

31.    Defendant William J. Mullaney ("Mullaney") was MetLife and MLIC's President, U.S. Business from August 2009 to November 2011 and President, Institutional Business from January 2007 to July 2009. Mullaney was also President of MPC from January 2005 to January

2007; a Senior Vice President of MPC from July 2002 to December 2004; Senior Vice President, Institutional Business of MLIC from August 2001 to July 2002; and a Vice President of MLIC from at least 1996 to 2001. Mullaney also served as a director of MetLife Bank. Mullaney will continue to serve in a consulting capacity at MetLife until March 31, 2012. Mullaney knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning the Company's: (i) current liabilities; (ii) the merits of the investigations by state authorities into its retained asset accounts; and (iii) the Company's operating earnings. Moreover, Mullaney utterly failed to maintain inadequate internal controls related to the Company's financial statements and compliance with applicable laws, rules, and regulations. MetLife paid Mullaney the following compensation as an executive:

| Fiscal Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| 2010 | $610,417 | $370,480 | $896,000 | $1,500,000 | $739,081 | $76,576 | $4,691,554 |
| 2009 | $562,500 | $621,000 | $411,000 | $1,000,000 | $875,838 | $76,651 | $3,546,989 |

Mullaney is a citizen of New Jersey.

32.    The defendants identified in ¶¶14-17, 30-31 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶14, 18-30 are referred to herein as the "Director Defendants." The defendants identified in ¶¶18-21, 28-29 are referred to herein as the "Audit Committee Defendants." The defendants identified in ¶¶18, 21-28, 30 are referred to herein as the "Investment Committee Defendants." The defendants identified in ¶¶21-22, 26-29 are referred to herein as the "Finance and Risk Policy Defendants." Collectively, the defendants identified in ¶¶14-31 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

### Fiduciary Duties

33.    By reason of their positions as officers, directors, and/or fiduciaries of MetLife and because of their ability to control the business and corporate affairs of MetLife, the

Individual Defendants owed and owe MetLife and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage MetLife in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of MetLife and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

34.     Each officer and director of the Company owes to MetLife and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

**Additional Duties of the Audit Committee Defendants**

35.     In addition to these duties, under the Company's Audit Committee Charter in effect since January 21, 2004, Audit Committee Defendants Grisé, Keane, Kelly, Kinney, Price, and Sicchitano, owed specific duties to MetLife to review and approve the Company's earnings press releases, guidance, and quarterly and annual financial statements. Moreover, the Audit Committee Defendants were also responsible for reviewing and approving the adequacy of the Company's internal controls over financial reporting, which would include the Company's risk exposure and liabilities related to the SSA-DMF. In order to comply with their duties under the Audit Committee Charter, the Audit Committee Defendants were also responsible the Company's legal and regulatory requirements. The Audit Committee met ten, nine, eleven, and nine times in 2007, 2008, 2009, and 2010, respectively.

**Additional Duties of the Investment Committee Defendants**

36.     In addition to these duties, MLIC also has an Investment Committee.   The
Investment Committee Defendants Burwell, Castro-Wright, Grisé, Henrikson, Hubbard, Kilts,
Kinney, Satcher, Sicchitano, and Wang all served on the Investment Committee during the times
complained of.   The Investment Committee Defendants owed specific duties to MetLife to
review and approve the Company's "compliance with insurance laws and regulations that govern
insurance company investments."   The Investment Committee met eight, seven, nine, and six
times in 2007, 2008, 2009, and 2010, respectively.

**Additional Duties of the Finance and Risk Policy Committee Defendants**

37.     In addition to their general duties, under the Company's Finance and Risk Policy
Committee Charter, Finance and Risk Policy Committee Defendants Burwell, Castro-Wright,
Hubbard, Kelly, Kilts, Kinney, Sicchitano, and Wang, owed specific duties to MetLife to assess
and manage the Company's material risks. The Finance and Risk Policy Committee also reviews
"the Company's policies, practices and procedures regarding risk assessment, management, and
mitigation." The Finance and Risk Policy Committee is also directly responsible for reviewing
MetLife Bank's "capitalization management, results and operations."   The Finance and Risk
Policy Committee met three, seven, six, and eight, times in 2007, 2008, 2009, and 2010,
respectively.

**Control, Access, and Authority**

38.     The Individual Defendants, because of their positions of control and authority as
officers and/or directors of MetLife, were able to and did, directly and/or indirectly, exercise
control over the wrongful acts complained of herein, as well as the contents of the various public
statements issued by the Company.

39.     Because of their advisory, executive, managerial, and directorial positions with
MetLife, each of the Individual Defendants had access to adverse, non-public information about

the financial condition, operations, and growth prospects of MetLife. While in possession of this material, non-public information, the Individual Defendants made improper representations regarding the Company, including information regarding the adequacy of MetLife's reserves and its retained asset accounts.

40.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of MetLife, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

41.    To discharge their duties, the officers and directors of MetLife were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of MetLife were required to, among other things:

(a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health;

(c)    remain informed as to how MetLife conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws;

(d)    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

- 20 -

(e)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

**Breaches of Duties**

42.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of MetLife, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company have been ratified by the remaining Individual Defendants who collectively comprised all of MetLife's Board.

43.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to not comply with its legal obligations with its use of the SSA-DMF and failed to adequately reserve for its life insurance payouts.    The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct, the Company is now the subject of a class action lawsuit that alleges violations of securities laws.    As a result, MetLife has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

44.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

45.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of MetLife, regarding the Individual Defendants' management of MetLife's operations and failure to accurately guide the public regarding its failure to regularly use the SSA-DMF to determine whether death benefit payments were due under life insurance policies; and (ii) enhance the Individual Defendants' executive and directorial positions at MetLife and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

46.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

47.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breach of fiduciary duties, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

48.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release

improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

49.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL BACKGROUND

**MetLife's Business**

50.     MetLife is a global provider of insurance, annuities, and employee benefit programs, serving ninety million customers in over sixty countries. According to the Company, MetLife holds leading market positions in the United States, Japan, Latin America, Asia Pacific, Europe, and the Middle East. The Company is organized into five business segments: Insurance Products, Retirement Products, Corporate Benefit Funding, Auto & Home (collectively, U.S. Business), and International. MetLife has sold and serviced insurance products for more than 100 years in the United States.

**MetLife's Use of the SSA-DMF Database**

51.     A significant amount of the Company's operating income and investment income is inextricably intertwined with historical processes, procedures, and policies for investigation and paying claims. For example, the Company has engaged in the use of the SSA-DMF since the 1980s. The SSA-DMF is a government-maintained database of all deaths recorded in the United States. The SSA-DMF currently contains over eighty-nine million records and is updated weekly. The file is created from internal SSA records of deceased persons possessing social

security numbers whose deaths were reported to the SSA. The SSA-DMF includes the following: last name, first name, social security number, state issued, birth date, death date, last residence, and lump sum payment. For over thirty years, MetLife has used the SSA-DMF to identify whether its annuity policyholders have died so that the Company can immediately *stop* making annuity payments to deceased policyholders.

52.     However, the Company *did not* check the SSA-DMF for deaths where it would have to make a payment to a beneficiary – a liability for the Company. Moreover, a death also starts the clock for escheatment of unclaimed property or benefit funds to relevant state authorities in the event that beneficiaries were either not located or did not submit a claim to the Company within the statutory period.

53.     Further, the Company has recently admitted that even when it learned of the death of a policyholder and confirmed the death through its in-house death indices or through the use of the SSA-DMF, it would not immediately recognize the death as a liability, but instead, would only begin an investigation into the apparent proof of death. These processes and procedures had the effect of maintaining monies and accounts that could have and likely should have been paid out to beneficiaries of its policyholders or instead escheated to the relevant state authorities after the "dormancy period" expired. The result of MetLife's practices and procedures resulted in dozens of investigations by state and federal authorities.

## IMPROPER STATEMENTS

54.     The Individual Defendants compounded their wrongdoing by concealing the Company's true business health from the public. They caused the Company to issue improper statements that concealed the depth and liability faced by the various government investigations and improper financial results. The Officer Defendants knowingly, reckless, or with gross negligence made these improper statements and the Director Defendants made them knowingly or recklessly.

55.     On February 2, 2010, the Company issued a press release announcing its fourth

quarter and fiscal year 2009 financial results.  The Company reported positive financial results,

including "[o]perating earnings of $882 million, up significantly from $277 million, largely due

to strong business growth, [and] significant equity market improvements."  The press release

stated as follows:

> *"MetLife delivered a very strong fourth quarter, with operating earnings*
> *significantly higher than a year ago, and both our fourth quarter and full year*
> *2009 earnings are above the estimates we provided at Investor Day in*
> *December,"* said C. Robert Henrikson, chairman, president & chief executive
> officer of MetLife, Inc.  "Our businesses throughout the U.S. and internationally
> have performed very well, generating a 14% increase in premiums, fees & other
> revenues over the fourth quarter of 2008, and a 4% increase over full year 2008
> despite a difficult economic environment.  *Furthermore, in 2009 we had solid*
> *underwriting, better expense margins as well as both improving investment*
> *income and declining investment losses."*
>
>       \*   \*   \*
>
> **U.S. BUSINESS**
>
> - U.S. Business premiums, fees & other revenues of $7.8 billion, up 11%
>   with increases of 32% in Retirement Products, 26% in Corporate Benefit
>   Funding and 8% in Insurance Products
>
>       \*   \*   \*
>
> - *Operating earnings of $882 million, up significantly from $277 million,*
>   largely due to strong business growth, [and] significant equity market
>   improvements....
>
> Insurance Products
>
> Premiums, fees & other revenues for Insurance Products, which includes group
> life, non-medical health and individual life insurance, were up 8%, reflecting
> growth across all the product groups.  Revenue growth in both group life and
> individual life was solid, while non-medical health benefited from growth in the
> dental business.
>
>       \*   \*   \*
>
> Insurance Products operating earnings were $400 million, up 55% due in large
> part to higher net investment income, solid underwriting results in *both group life*
> *and individual life....*
>
> Retirement Products

- 25 -

Premiums, fees & other revenues for Retirement Products were $732 million, up 32% on increased sales of immediate annuities and higher fee income. Total annuity sales continued to be strong at $4.2 billion, up from $4.0 billion in the third quarter of 2009.... *In addition, total annuity lapse rates declined for the fourth consecutive quarter with annuity net flows continuing to be positive for the seventh consecutive quarter.*

56.      On February 26, 2010, the Company filed its Form 10-K for the year ending December 31, 2009 with the SEC. The Form 10-K contained improper statements by defendants Burwell, Castro-Wright, Grisé, Hubbard, Keane, Kelly, Kilts, Kinney, Price, Satcher, Sicchitano, Wang, Henrikson, Wheeler, and Carlson. The Form 10-K repeated in substantial part the financial results reported in the February 2, 2010 press release. In addition to the financial results, the Form 10-K described the manner in which the Company set and adjusted its loss reserves (known as incurred but not reported ("IBNR")), including liabilities for deaths that had occurred but had not yet been reported. These disclosures failed to inform the public that the Company was not checking the SSA-DMF for customers who had recently died and who the Company would have to pay death benefits on either to the beneficiary of the policy or the state. The Form 10-K stated:

*Other Policyholder Funds*

Other policyholder funds include policy and contract claims, unearned revenue liabilities, premiums received in advance, policyholder dividends due and unpaid and policyholder dividends left on deposit.

*The liability for policy and contract claims generally relates to incurred but not reported death, disability, long-term care and dental claims, as well as claims which have been reported but not yet settled.* The liability for these claims is based on the Company's estimated ultimate cost of settling all claims. The Company derives estimates for the development of incurred but not reported claims principally from actuarial analyses of historical patterns of claims and claims development for each line of business. The methods used to determine these estimates are continually reviewed. Adjustments resulting from this continuous review process and differences between estimates and payments for claims are recognized in policyholder benefits and claims expense in the period in which the estimates are changed or payments are made.

57.    On April 29, 2010, the Company issued a press release announcing MetLife's first

quarter 2010 financial results. The press release reported positive financial results with operating

earnings for the first quarter of 2010 at $834 million. The press release stated as follows:

> MetLife, Inc. today reported first quarter 2010 net income of $805 million, or $0.97 per share, which reflects net investment gains and losses. *Operating earnings for the first quarter of 2010 were $834 million, or $1.01 per share.*
>
> "MetLife delivered very strong first quarter results, generating significant earnings growth, growing premiums, fees & other revenues by 12% and increasing net investment income by 31%," said C. Robert Henrikson, chairman, president & chief executive officer of MetLife, Inc. "Improved equity market levels, *solid underwriting results and our expense savings efforts also contributed to our strong performance in the quarter.*"
>
> \*  \*  \*
>
> **U.S. BUSINESS**
>
> • U.S. Business premiums, fees & other revenues of $7.4 billion, up 11% largely due to growth in Corporate Benefit Funding and Retirement Products
>
> \*  \*  \*
>
> • Operating earnings of $757 million, up from $178 million due to significant business growth, equity market improvements, higher net investment income and lower expenses
>
> Insurance Products
>
> Premiums, fees & other revenues for Insurance Products – which includes group life, individual life and non-medical health insurance   were up 2%, largely driven by an increase in group life....
>
> *Operating earnings for Insurance Products were $298 million, up 92% due in large part to higher net investment income, favorable group life underwriting results and lower expenses.*
>
> Retirement Products
>
> Premiums, fees & other revenues for Retirement Products – which includes individual and institutional annuities – were $684 million, up 27% on increased fee revenue....
>
> *Operating earnings for Retirement Products were $159 million, compared with a $118 million operating loss.*

58.    On July 29, 2010, the New York State Attorney General, Andrew Cuomo, announced that his office had issued subpoenas to MetLife and certain other insurance carriers related to the potentially improper retention of death benefits owed to beneficiaries of deceased policyholders. On the same day, *Bloomberg* published an article entitled "Gates Says Pentagon to Help Death Benefits-Inquiry." The *Bloomberg* article discussed the New York Attorney General's subpoenas and fraud probe into MetLife and other insurance carriers and noted that reports suggest that insurance carriers earn investment income on more than $28 billion owed to beneficiaries. The article stated:

### Gates Says Pentagon to Help Death-Benefits Inquiry

Defense Secretary Robert Gates pledged to help the U.S. Department of Veterans Affairs probe how insurers reap profits from death benefits retained for the families of deceased military personnel.

\* \* \*

The investigations, along with a review by the New York State Insurance Department, were prompted by a Bloomberg Markets magazine report that more than 100 carriers earn investment income on $28 billion owed to life insurance beneficiaries. New York-based MetLife, the biggest U.S. life insurer, and No. 2 Prudential are among the firms that administer the so-called retained-asset accounts.

\* \* \*

Cuomo, in a statement today, called it "shocking and plain wrong for these multinational life insurance companies to pocket hundreds of millions in profits that really belong to those who have lost family members."

\* \* \*

… There are no public records showing how much companies are holding in the retained-asset accounts, Bloomberg Markets reported.

"It appears that the substantial interest earned on these accounts mostly benefit and enrich the insurers at the expense of the families to whom the money really belongs," Cuomo said.

59.    Despite the investigations by the New York Attorney General and the *Bloomberg* article, the Individual Defendants continued to make improper statements regarding the

Company's improper retention of funds that should have been paid to beneficiaries and made no disclosure that the Company retained funds that did not belong to it.  On July 29, 2010, the Company issued a press release announcing its second quarter 2010 financial results.  The press release stated as follows:

> MetLife, Inc. today reported second quarter 2010 net income of $1.5 billion, or $1.84 per share.  Net income reflects net investment gains of $767 million, after tax, including gains on derivatives.  Operating earnings for the second quarter of 2010 were $1.0 billion, or $1.23 per share.
>
> "MetLife continued to deliver strong results during the second quarter as we achieved top line growth and increased operating earnings by 41% over the prior year period," said C. Robert Henrikson, chairman, president & chief executive officer of MetLife, Inc.  *"Highlights of the quarter included strong underwriting results, higher net investment income and our disciplined approach to expense management."*
>
> * * *
>
> **U.S. BUSINESS**
>
> - U.S. Business premiums, fees & other revenues of $7.2 billion, up 2% as a 34% increase in Retirement Products was offset by lower pension closeout sales in Corporate Benefit Funding
>
> - *Excellent underwriting results in group life; improved experience in dental and solid underwriting results in individual life*
>
> - Total annuity sales of $4.8 billion and continued low lapse rates generated significantly positive net flows
>
> - *Operating earnings of $918 million, up 39% due to favorable underwriting, higher net investment income and lower expenses*
>
> <u>Insurance Products</u>
>
> Premiums, fees & other revenues for Insurance Products – which includes group life, individual life and non-medical health insurance – were up 2%, largely driven by an increase in group life.
>
> * * *
>
> *Operating earnings for Insurance Products were $369 million, up 29% due to favorable underwriting, higher net investment income and lower expenses.*
>
> <u>Retirement Products</u>
>
> Premiums, fees & other revenues for Retirement Products – which includes the company's U.S. annuity products – were $766 million, up 34% largely on

increased fee revenue. Compared with the first quarter of 2010, total annuity sales were up 10%, including an 11% increase in variable annuity sales.

*Operating earnings for Retirement Products were $238 million, up 66%.*

60.    On August 2, 2010, the Company filed its Form 10-Q for the second quarter of 2010. The Form 10-Q substantially repeated the second quarter 2010 financial results reported in the July 29, 2010 press release. In addition, in discussing the New York Attorney General's investigation and the manner in which the Company treats its retained asset accounts, unclaimed property and death benefits, the Company stated that any allegations that its retained asset accounts or the treatment of funds therein, including disclosures regarding the same, violated any state or federal laws were "*without merit*." These statements were improper when made and would result in the Company being damaged. The Form 10-Q stated:

*Retained Asset Account Matters*

\* \* \*

The New York Attorney General recently announced that his office had launched a major fraud investigation into the life insurance industry for practices related to the use of retained asset accounts and that subpoenas requesting comprehensive data related to retained asset accounts have been served on MetLife and other insurance carriers. We received the subpoena on July 30, 2010. It is possible that other state and federal regulators or legislative bodies may pursue similar investigations or make related inquiries. We cannot predict what effect any such investigations might have on our earnings or the availability of the TCA, but *we believe that our financial statements taken as a whole would not be materially affected. We believe that any allegations that information about the TCA is not adequately disclosed or that the accounts are fraudulent or otherwise violate state or federal laws are without merit*.

61.    On November 4, 2010, the Company filed its Form 10-Q for the third quarter of 2010. Once again, the Company claimed that the investigation into its retained asset accounts were "*without merit*." These statements were improper when made and would result in the Company being damaged. The Form 10-Q stated:

The New York Attorney General announced on July 29, 2010 that his office had launched a major fraud investigation into the life insurance industry for practices related to the use of retained asset accounts and that subpoenas requesting comprehensive data related to retained asset accounts had been served on MetLife

- 30 -

and other insurance carriers. The Company received the subpoena on July 30, 2010. The Company also has received requests for documents and information from U.S. congressional committees and members as well as various state regulatory bodies, including the New York Insurance Department. It is possible that other state and federal regulators or legislative bodies may pursue similar investigations or make related inquiries. We cannot predict what effect any such investigations might have on our earnings or the availability of the TCA, but *we believe that our financial statements taken as a whole would not be materially affected. We believe that any allegations that information about the TCA is not adequately disclosed or that the accounts are fraudulent or otherwise violate state or federal laws are without merit.*

62.    On February 9, 2011, the Company issued a press release announcing its financial

results for its fourth quarter and fiscal year 2010. The press release stated as follows:

MetLife, Inc. today reported fourth quarter 2010 net income of $51 million, or $0.05 per share, and operating earnings of $1.2 billion, or $1.14 per share. Derivative losses drove most of the difference between net income and operating earnings in the fourth quarter of 2010.

MetLife today also reported full year 2010 net income of $2.7 billion, or $3.00 per share. Operating earnings for the full year 2010 were $3.9 billion, or $4.38 per share.

*"Our 2010 financial* results *were strong, including a 65% increase in operating earnings, which is consistent with the guidance we provided in December at Investor Day,"* said C. Robert Henrikson, chairman, president & chief executive officer of MetLife, Inc.

\* \* \*

**FOURTH QUARTER 2010 SUMMARY**

\* \* \*

* Premiums, fees & other revenues of $9.7 billion, up 4% over the fourth quarter of 2009 and up 12% over the third quarter of 2010

* Strong U.S. annuity sales of $5.5 billion, up 28% over the fourth quarter of 2009

* Operating earnings of $1.2 billion ($1.14 per share), reflecting:

    * dilution of $0.15 per share resulting from the acquisition of Alico

    * strong variable investment income, which was above the plan range by $138 million ($0.17 per share), after tax and the impact of deferred acquisition costs (DAC)

    * a $48 million ($0.06 per share), after tax, reduction in earnings due to the impact of the company's variable annuity hedge program,

which more than offset the benefit of higher equity markets and interest rates

\* \* \*

## U.S. BUSINESS

- U.S. Business premiums, fees & other revenues of $7.2 billion, down 8% as a 23% increase in Retirement Products fees was more than offset by a decline in Insurance Products and Corporate Benefit Funding premiums, fees & other revenues

- Record variable annuity sales of $5.1 billion, up 38%

- *Operating earnings of $841 million, down 5% as strong results in Corporate Benefit Funding earnings were offset by lower earnings in Insurance Products and Retirement Products; increased amortization of DAC* and other adjustments as a part of the annual review of DAC assumptions reduced U.S. Business earnings by $17 million ($0.02 per share), after tax

Insurance Products

Premiums, fees & other revenues for Insurance Products – which includes group life, individual life and non-medical health insurance – were $5.1 billion, down 4% as an increase in the dental business was offset by declines in other businesses in the segment.

*Operating earnings for Insurance Products were $309 million, down 23% as higher net investment income was more than offset by increased amortization of DAC and other adjustments.* In addition, group life underwriting results remained solid and were consistent with fourth quarter 2009 results.

Retirement Products

Premiums, fees & other revenues for Retirement Products – which includes the company's U.S. annuity products – were $812 million, down $1 million. Total annuity sales increased 28% due to strong growth in variable annuities. In addition, total annuity net flows were strong at $2.2 billion and higher than in both the third quarter of 2010 and fourth quarter of 2009.

*Operating earnings for Retirement Products were $175 million, down 17% as higher net investment income and separate account fees were more than offset by the impact of the company's variable annuity hedge program described above as well as less favorable unlocking of DAC and other adjustments.*

63.    On February 25, 2011, the Company filed its Form 10-K for the fiscal year ending December 31, 2010 with the SEC. The Form 10-K substantially repeated the financial results reported in the February 9, 2011 press release. The Form 10-K contained improper statements

by defendants Burwell, Castro-Wright, Grisé, Hubbard, Keane, Kelly, Kilts, Kinney, Price, Satcher, Sicchitano, Wang, Henrikson, Wheeler, and Carlson.    The Form 10-K contained improper statements concerning the Company's reserve methodologies. The Form 10-K stated:

> Claims experience varied amongst Insurance Products' businesses with a net unfavorable impact of $42 million to operating earnings. *We experienced excellent mortality results in our group life business due to a decrease in severity, as well as favorable reserve refinements in the current year.*

> \* \* \*

> *Liability for Future Policy Benefits and Policyholder Account Balances*

> The Company establishes liabilities for amounts payable under insurance policies, including traditional life insurance, traditional annuities, certain accident and health, and non-medical health insurance. Generally, amounts are payable over an extended period of time and related liabilities are calculated as the present value of future expected benefits to be paid reduced by the present value of future expected premiums. Such liabilities are established based on methods and underlying assumptions in accordance with GAAP and applicable actuarial standards.

> \* \* \*

> Future policy benefit liabilities for non-participating traditional life insurance policies are equal to the aggregate of the present value of expected future benefit payments and related expenses less the present value of expected future net premiums. *Assumptions as to mortality and persistency are based upon the Company's experience when the basis of the liability is established.*

> \* \* \*

> *The Company regularly evaluates estimates used and adjusts the additional liability balances, with a related charge or credit to benefit expense, if actual experience or other evidence suggests that earlier assumptions should be revised.*

> \* \* \*

> *Other Policy-Related Balances*

> Other policy-related balances include policy and contract claims, unearned revenue liabilities, premiums received in advance, negative VOBA, policyholder dividends due and unpaid and policyholder dividends left on deposit.

> *The liability for policy and contract claims generally relates to incurred but not reported death, disability, long-term care and dental claims, as well as claims which have been reported but not yet settled. The liability for these claims is based on the Company's estimated ultimate cost of settling all claims. The*

*Company derives estimates for the development of incurred but not reported claims principally from actuarial analyses of historical patterns of claims and claims development for each line of business.* The methods used to determine these estimates are continually reviewed.    Adjustments resulting from this continuous review process and differences between estimates and payments for claims are recognized in policyholder benefits and claims expense in the period in which the estimates are changed or payments are made.

64.    In addition to the above, the February 25, 2011 Form 10-K again disclosed that the New York Attorney General had launched a major fraud investigation into the manner in which the Company keeps and reports the value of its retained asset accounts, which included monies that had not been claimed by policyholders or their beneficiaries and had not been escheated to the relevant state authorities.    The Individual Defendants continued to assure investors, however, that while the investigations were ongoing and certain other regulatory bodies might join said investigations, any allegations that any information concerning the retained asset accounts was not disclosed or that it violated any state or federal laws were simply *"without merit."* The Form 10-K improper stated:

*Retained Asset Account Matters*

The New York Attorney General announced on July 29, 2010 that his office had launched a major fraud investigation into the life insurance industry for practices related to the use of retained asset accounts as a settlement option for death benefits and that subpoenas requesting comprehensive data related to retained asset accounts had been served on MetLife and other insurance carriers.... It is possible that other state and federal regulators or legislative bodies may pursue similar investigations or make related inquiries. Management cannot predict what effect any such investigations might have on the Company's earnings or the availability of the Company's retained asset accounts known as the Total Control Account ("TCA"), but management believes that the Company's consolidated financial statements taken as a whole would not be materially affected. *Management believes that any allegations that information about the TCA is not adequately disclosed or that the accounts are fraudulent or otherwise violate state or federal laws are without merit.*

65.    On April 25, 2011, the California Insurance Commissioner issued a press release announcing an investigation into MetLife's practices regarding the withholding of death benefits, even after having notice that a policyholder had died.    The California Insurance Commissioner's

press release stated, "*The Commissioner and the Controller are responding to preliminary findings from an audit the Controller launched in 2008, indicating that for two decades, MetLife failed to pay life insurance policy benefits to named beneficiaries or the State even after learning that an insured had died.*" The California Insurance Commissioner went on to state that "the preliminary findings show, *when MetLife knew that an owner of an annuity contract – which generates income for the policy owner at the time the annuity matures – had died, or the annuity had matured, the company did not contact the policy holder or beneficiary, even though it subscribed to the "Death Master" database.*"

66.    On May 4, 2011, the Company issued a press release announcing its first quarter 2011 financial results. The press release stated as follows:

> MetLife, Inc. today reported first quarter 2011 net income of $830 million, or $0.78 per share, and operating earnings of $1.4 billion, or $1.33 per share.
>
> "With record top-line performance and a 64% increase in operating earnings over the first quarter of 2010, MetLife delivered very strong results in the first quarter of 2011," said Steven A. Kandarian, who became president & chief executive officer of MetLife, Inc. on May 1, 2011. "In addition to benefiting from the acquisition of Alico, *we grew operating earnings in our U.S. Business by 15% while total net investment income increased 14% over the first quarter of 2010.*
>
> *   *   *
>
> **U.S. BUSINESS**
>
> • U.S. Business premiums, fees & other revenues of $7.0 billion
>
> *   *   *
>
> • *Operating earnings of $908 million, up 15% due to increases in Insurance Products, Retirement Products and Corporate Benefit Funding*
>
> Insurance Products
>
> Premiums, fees & other revenues for Insurance Products – which includes group life, individual life and non-medical health insurance – were $5.0 billion, down 2%. *Operating earnings for Insurance Products were $350 million, up 17% driven by strong underwriting results in group life and non-medical health. Results reflect the company's continued commitment to pricing discipline.*

Retirement Products

> Premiums, fees & other revenues for Retirement Products – which includes the
> company's U.S. annuity products – were $867 million, up 13%. Total annuity
> sales increased 34% to $6.1 billion, driven by strong growth in variable annuities
> across all distribution channels. In addition, total annuity net flows were strong at
> $2.6 billion and higher than in both the first and fourth quarters of 2010.
> ***Operating earnings for Retirement Products were $212 million, up 5% driven
> by higher separate account fee income.***

67. On May 10, 2011, the Company filed its Form 10-Q for the period ending March

31, 2011. The Form 10-Q repeated, in substance, the financial results reported in the May 4,

2011 press release. The Company again reported on the investigations of the state regulatory

agencies into its death benefit practices and the usage of its retained asset accounts.

Notwithstanding ongoing audits and the preliminary findings by the California Insurance

Commission and State Controller, the Company maintained that allegations of fraud concerning

the usage of its retained asset accounts and violations of ***state or federal laws were without***

***merit.*** The Form 10-Q stated:

> *Retained Asset Account Matters*
>
> The New York Attorney General announced on July 29, 2010 that his office had
> launched a major fraud investigation into the life insurance industry for practices
> related to the use of retained asset accounts as a settlement option for death
> benefits and that subpoenas requesting comprehensive data related to retained
> asset accounts had been served on MetLife and other insurance carriers ... It is
> possible that other state and federal regulators or legislative bodies may pursue
> similar investigations or make related inquiries. Management cannot predict what
> effect any such investigations might have on the Company's earnings or the
> availability of the Company's retained asset accounts known as the Total Control
> Account ("TCA"), but management believes that the Company's consolidated
> financial statements taken as a whole would not be materially affected.
> Management believes ***that any allegations that information about the TCA is not
> adequately disclosed or that the accounts are fraudulent or otherwise violate
> state or federal laws are without merit.***

68.    On May 19, 2011, certain of MetLife's executive officers testified in the State of Florida before the Officer of Insurance Regulations and National Association of Insurance Commissioners. MetLife's Executive Vice President, Todd B. Katz ("Katz"), and its Senior Vice President, Frank Cassandra ("Cassandra"), gave testimony before the Commission along with the Company's counsel, Teresa Roseborough. During the hearing, Katz and Cassandra, testified that the Company in fact has used the SSA-DMF since the 1980s for many of its businesses along with other databases and matches annuities against the SSA-DMF once per month. Among other things, the MetLife executives testified as follows:

- Upon receiving an indication of death, MetLife would suspend annuity payments and did not require a death certificate before suspending annuity payments.

- The Company has maintained a "Metropolitan Unclaimed Fund System" since 1987. The Unclaimed Fund System tracks the date on which funds are put into the system and calculates the date of escheatment. However, the date on which money is entered into the Unclaimed Fund System is administrative and not necessarily when a person is identified as dead in the SSA-DMF.

- In 2007, the Company used the SSA-DMF to do a sweep and learned of deaths that had occurred as early as 1965 as a result of using the SSA-DMF index, yet only started the dormancy period for escheatment from June 2007, meaning that defendants knew that the liability had been incurred, and in fact had been incurred years earlier, but specifically intended to hold the money for an additional period (or relevant state escheatment period).

- The Company admitted that even if it found during its searches in 2010 that a person died in 2005, it would start the dormancy period as of the date of the match as opposed to the date of the death.

69.    On July 5, 2011, *Reuters* reported that the New York Attorney General had issued subpoenas to nine life insurance companies, including MetLife, specifically demanding information regarding their procedures for identifying beneficiaries of life insurance policies and compliance with relevant state escheatment laws:

New York's top legal officer has sent subpoenas to nine leading life insurers seeking information about their practices in identifying and paying out policies for deceased customers.

*    *    *

- 37 -

*The investigation is looking into whether insurance companies have done enough to identify beneficiaries of life insurance policies once a customer dies, the source told Reuters on Tuesday.*

*Schneiderman's office is also seeking information about unclaimed policy proceeds that are supposed to be turned over to the state.*

70.     On July 28, 2011, despite the investigations by Florida's Officer of Insurance Regulations and National Association of Insurance Commissioners and the subpoenas by the New York Attorney General, the Company issued a press release announcing its financial results for the second quarter of 2011 that did not contain any mention of the Company's liability related to these and other jurisdictions' ongoing investigations. The press release stated as follows:

MetLife, Inc. today reported *second quarter 2011 net income of $1.2 billion, or $1.13 per share, and operating earnings of $1.3 billion, or $1.24 per share.*

"MetLife delivered strong results during the second quarter," said Steven A. Kandarian, president and chief executive officer of MetLife, Inc.  "We grew earnings per share by 13% over the prior-year quarter while generating a record $11.8 billion in premiums, fees and other revenues. *The fact that we were able to deliver these results despite losses from natural disasters in the United States and Japan is a testament to the earnings power of MetLife's diverse portfolio of businesses."*

\*   \*   \*

**U.S. BUSINESS**

- U.S. Business operating earnings of $908 million, up 12% due to increases in Insurance Products, Retirement Products and Corporate Benefit Funding

\*   \*   \*

- *Excellent underwriting results in group life* as well as continued improvement in non-medical health, particularly in the dental business

- Premiums, fees & other revenues of $7.6 billion, up 6% due to premium growth in Corporate Benefit Funding and higher fee revenue in Retirement Products

Insurance Products

Operating earnings for Insurance Products – which includes group life, individual life and non-medical health insurance – were $449 million, up 22% due to increases in all three business lines. *In particular, the rise in earnings was driven by record underwriting results in group life, solid underwriting in non-medical health and higher net investment income. Premiums, fees & other revenues for Insurance Products were $5.0 billion, relatively unchanged.*

- 38 -

Retirement Products

*Operating earnings for Retirement Products – which includes the company's U.S. annuity products – were $201 million, up 48% driven by higher separate account fee income.* Total annuity sales increased 48% to $7.3 billion, driven by strong growth in variable annuities across all distribution channels. In addition, total annuity net flows were very strong at $3.8 billion and higher than in both the first quarter of 2011 and the second quarter of 2010. Premiums, fees & other revenues for Retirement Products were $937 million, up 15% due to higher fee income.

## THE TRUTH BEGINS TO EMERGE

71.    Just one week later, on August 5, 2011, the Company filed its Form 10-Q for the

period ending September 30, 2011 with the SEC. The Company disclosed that the regulatory

investigations into its death benefits practices had *expanded to more than thirty jurisdictions.*

In addition, gone from the Form 10-Q were the previously reported denials that allegations

concerning the Company's retained asset accounts and potential violations of state and federal

laws were "without merit." Instead, for the first time the Company disclosed that it might be

subject to *"additional escheatment"* to the states and that the costs related to said investigations

could be *"substantial"*:

Unclaimed Property Inquiries.  More than 30 U.S. jurisdictions are auditing MetLife, Inc. and certain of its affiliates for compliance with unclaimed property laws.  Additionally, MLIC and certain of its affiliates have received subpoenas and other regulatory inquiries from certain regulators and other officials relating to claims-payment practices and compliance with unclaimed property laws.  On July 5, 2011, the New York Insurance Department issued a letter requiring life insurers doing business in New York to use data available on the U.S. Social Security Administrations Death Master File or a similar database to identify instances where death benefits under life insurance policies, annuities, and retained asset accounts are payable, to locate and pay beneficiaries under such contracts, and to report the results of the use of the data.  It is possible that other jurisdictions may pursue similar investigations or inquiries, or issue directives similar to the New York Insurance Departments letter. *It is possible that the audits and related activity may result in additional payments to beneficiaries, additional escheatment of funds deemed abandoned under state laws, administrative penalties, and changes to the Company's procedures for the identification and escheatment of abandoned property.  The Company is not currently able to estimate the reasonably possible amount of any such additional payments or the reasonably possible cost of any such changes in procedures, but it is possible that such costs may be substantial.*

72.    On August 5, 2011, *Bloomberg* issued an article discussing the Company's August 5, 2011 Form 10-Q, which disclosed that thirty jurisdictions were investigating the Company's practices with respect to paying death benefits. The article noted the Company's disclosure that the cost of the investigations and additional escheatments to the states could be substantial:

### MetLife Says 30 Jurisdictions Are Auditing Unpaid Benefits

MetLife Inc. (MET), the largest U.S. life insurer, said more than 30 U.S. jurisdictions are auditing its practices in a review of whether the *industry is holding unclaimed funds owed to policyholders, beneficiaries or states.*

*The audits may lead to more payments to beneficiaries, administrative penalties or changes in procedures,* New York-based MetLife said today in its quarterly filing with the U.S. Securities and Exchange Commission.

*"The company is not currently able to estimate the reasonably possible amount of any such additional payments or the reasonably possible cost of any such changes in procedures," MetLife said.  "It is possible that such costs may be substantial."*

73.    The August 5, 2011 disclosures in MetLife's Form 10-Q concerning the possibility of additional audits and related activity that may result in administrative penalties, additional payments, and escheatment of abandoned property, caused the Company's value to drop $4.4 billion, or 11%, in a single trading day.

74.    Despite investigations in over thirty states, the Company waited until October 6, 2011, to disclose that it would have to reserve for losses related to these investigations. On that day, the Company filed a Form 8-K with the SEC quantifying the current impact of its prior failure to report and account for INBR liabilities, stating among other things that it would take at least a $115 million after-tax charge to increase its reserves in connection with its use of the SSA-DMF to identify deceased policyholders. The Form 8-K stated:

*MetLife, Inc. ... has identified the following non-recurring charges that it expects to incur for the third quarter of 2011:*

(1)    The Company expects to incur a $115 million to $135 million, after tax, charge to adjust reserves in connection with the Company's use of the U.S. Social Security Administration's Death Master File and similar databases to identify certain group life insurance certificates, individual life insurance policies and

other contracts where the covered person may be deceased, but a claim has not yet been presented to the Company.

75.    On October 7, 2011, Zacks Equity Research published an article entitled "MetLife's Charges to Dampen 3Q Results." The article discussed the Company's disclosures of a day earlier and the charges to reserves resulting from its failure to use the SSA-DMF to pay beneficiaries of insurance policies:

### MetLife's Charges to Dampen 3Q Results

Yesterday, MetLife Inc. (MET) intimidated [sic] about a string of charges worth about $275 million that it expects to incur in the third quarter of 2011, as per the statement filed with the Securities and Exchange Commission (SEC) and other federal authorities.

*The bulk of the extraordinary expenses include a post-tax charge of $115-135 million to make necessary alterations to its insurance reserves.  This primarily requires reaching out to those insurance policies and other contracts where the policyholders may have died but a claim is yet to be filed with MetLife.*

The effort to identify deceased cases where claims are yet to be paid out follows from the subpoena received from the regulators in California. This subpoena is primarily aimed at auditing the benefit payout practices of MetLife and its peers. Accordingly, the company aims to track down these cases by using the databases from the Social Security Administration and other sources.

76.    On October 7, 2011, A.M. Best published an article discussing the expected charges related to the Company's use of the SSA-DMF:

MetLife to Record Up to $275 Million in Charges; Some on Social Security Death Master File

*MetLife Inc. will post up to $275 million in third-quarter charges, in part, on adjusting reserves related to its use of the U.S. Social Security Administration's Death Master File and similar databases.*

In a Form 8-K, MetLife said it expects to incur a $115 million to $135 million charge, after tax, related to the death master file, which lists the name of every Social Security number holder who has died.  The databases will identify some group life insurance certificates, individual life insurance policies and other contracts where a covered person may be dead but a claim hasn't yet been made.

77.    On October 27, 2011, the Company issued a press release announcing its third

quarter 2011 financial results. The press release revealed operating earnings were down 23%

due to the $117 million reserve taken. The press release stated as follows:

Insurance Products

*Operating earnings for Insurance Products – which includes group life, individual life and non-medical health insurance – were $265 million, down 23% largely due to the previously mentioned reserve adjustment, which impacted group and individual life results.*

78.    On October 28, 2011, the Company held a conference call for analysts and

investors to discuss the Company's third quarter 2011 financial results. The call was hosted by

defendants Wheeler and Kandarian.  During the call, defendants explained the impact of the

$117 million after-tax charge related to the death benefit and SSA-DMF issues alleged herein:

[KANDARIAN:]    Now let's discuss this quarter's results.    Despite some significant economic headwinds during the quarter, MetLife delivered earnings per share of $1.11, up 3% from the prior-year quarter.  As noted in the 8-K we filed October 6, MetLife recorded a number of one-time charges in the third quarter.  *Absent these charges and some other one-time items, MetLife's earnings would have been $1.28 per share, which we believe is closer to the Company's true earnings power.*  In addition, our annualized operating return on equity of 10.9% for the first nine months of the year would have been 11.5% without one-time items.

\* \* \*

[WHEELER:]  Thanks, Steve and good morning, everybody. MetLife reported net income of $3.6 billion or $3.33 per share and operating earnings of $1.2 billion or $1.11 per share for the third quarter.  There were several unusual items in this quarter. *First, we have taken an after-tax charge of $117 million or $0.11 per share to increase reserves in connection with our use of the US Social Security Administration's Death Master File and similar databases to identify potential life insurance claims for pending and incurred, but not reported claim liabilities referred to as IBNR – over 70% of the charges in our Group Life business, nearly 25% in Individual Life with the balance in Corporate Benefit Funding.*

\* \* \*

*The Group Life mortality ratio for the quarter was 98.5%. It's elevated due to the reserve strengthening related to the life insurance claims adjustment* that I mentioned previously. Adjusting for this item, the loss ratio was 88.9%, near the low end of the 2011 guidance range of 88% to 93% and in line versus the prior-

year quarter of 89%.    Overall, we are pleased with Group Life's steady
underwriting results reflecting our ongoing pricing discipline.

\* \* \*

*Our Individual Life mortality ratio for the quarter was 98.5%, elevated due to
the reserve strengthening* related to the life insurance claims adjustment that I
mentioned previously.  On the normalized basis, the mortality loss ratio was 89%,
up from the prior-year quarter of 86.7% and above plan due to higher large face
claims in the quarter.

\* \* \*

*While reserve adjustments go through the income statement,* the hedges in our
derivatives portfolio do not go through the income statement, but are rather
reflected in unrealized gains.  Therefore, our total adjusted capital, or TAC,
increased by $2.3 billion in the quarter, primarily due to unrealized gains on
derivatives and other invested assets and now stands at $28.7 billion as of
September 30.

79.    In press release dated December 5, 2011, entitled "Cuomo Administration

Announces that Life Insurance Investigation Results in $52 Million for Beneficiaries; More

Expected" the New York Department of Financial Services announced the following:

The Cuomo Administration announced today that life insurers have already made
$52.6 million in payments to almost 8,000 beneficiaries as a result of the
Department of Financial Service's investigation into the industry's failure to match
life insurance policies against a master file of deaths to find benefits that were due
but had not been paid. The Department, as part of its investigation, recently began
requiring all life insurers doing business in New York to use reliable, available
data to identify when policyholders have died and benefits are due.

Some life insurers use the U. S. Social Security Administration's Death Master
File, an up-to-date list of recent deaths, to promptly stop annuity payments once a
contract holder dies. However, many life insurers have not been using the same
Social Security death data to determine if any death benefit payments are due
under life insurance policies, annuity contracts or retained asset accounts.

Financial Services Superintendent Benjamin M. Lawsky said, "Our inquiry has
already resulted in nearly 8,000 people receiving more than $52 million that was
due them, and that is just the beginning. Our findings clearly show that matching
life insurance policies against a comprehensive list of recent deaths is essential to
ensure that all beneficiaries receive the benefits they are owed. And the fact that
some life insurers are already using the lists for this purpose and have paid out
hundreds of millions of dollars proves it can and should be done. With the initial
8,000 matches resulting in $52 million for beneficiaries, even if a small
percentage of the one million preliminary matches result in payments, the total
amount of payments could be huge."

- 43 -

The Department's review makes it clear that life insurers should regularly match life insurance policies against a comprehensive death list, rather than just wait for claims to be filed:

- Matching done as a result of the Department's review has already produced another almost 28,000 matches for which claims processing has been initiated and another almost one million matches that need further checking.

- Matching efforts begun by some life insurers prior to the Department's inquiry produced an additional $299 million in payments to beneficiaries.

- A small number of insurers have been performing regular cross-checks for a number of years, including Massachusetts Mutual Life Insurance Company and Prudential Insurance Company of America. Some other insurers have more recently adopted regular cross-check procedures, including Metropolitan Life Insurance Company.

The Department recently sent an administrative 308 letter to 172 life insurers and fraternal benefit societies licensed in New York. The letter directed them to use the Social Security death data, or other available data at least as comprehensive, to identify deceased policyholders of life insurance policies and deceased account holders of annuity contracts and retained asset accounts. The life insurers were then to determine whether any death benefits were due. For benefits due but not already paid, the life insurers were directed to make prompt payments to beneficiaries. The life insurers were required to report their findings monthly beginning October 31, 2011 and continuing for six months.

The Department today issued its first interim report on the information provided to date by life insurers. Nearly all life insurers provided a report for the first month and most had begun to investigate matches, but had not yet started to make payments. Those that did report have cross-checked approximately 79.22 million policy records against death data. This resulted in approximately 2.68 million initial matches. Many initial matches have been eliminated for reasons such as: the policy was not in force at the time of death; the apparent match turned out not to be the same person; or the claim had already been submitted.

There are 950,000 initial matches that still need further checking to determine if they are valid. Life insurers have initiated claims processing for payments to 27,889 other matches. The amount of those payments has not yet been reported to the Department. Meanwhile, 7,934 payments totaling $52.6 million have already been made to individuals, including 1,209 payments totaling $16.9 million made to New York payees.

The earliest year of death for which a benefit payment has been made thus far is 1970, and the largest benefit payment made thus far is $673,485. Insurers are required to pay interest on delayed payments.

80.    Also on December 5, 2011, the New York State Department of Financial Services issued an Interim Report of the Superintendent pursuant to Section 308 of the New York Insurance Law. The report confirmed that insurers, including MetLife, have retained monies for years that they knew or had reason to know should have been paid to beneficiaries on policyholders' deaths, some dating back to the 1970s:

**Interim Report of the Superintendent**
**Pursuant to Section 308 of the New York Insurance Law**
**Relating to Investigating Claims and Locating Beneficiaries Owed Death Benefits**
**Under Life Insurance Policies, Annuity Contracts, and Retained Asset Accounts**

December 5, 2011

*Summary*

LIFE INSURERS SHOULD REGULARLY MATCH life insurance policies against a reliable death list, rather than just waiting for claims to be filed. The technology exists, and it is clear that some insurers have been utilizing such death list databases in determining whether to curtail annuity payments. In response to the Department's investigation, life insurers that have undertaken the prescribed matching efforts have made $52.6 million in payments to almost 8,000 beneficiaries that would not have otherwise been made. About $16.9 million of that sum has been paid to New York payees. Moreover, matching done as a result of the Department's review has already produced another almost 28,000 matches for which claims processing has been initiated and located another almost one million initial matches that need further checking, but will likely result in substantial additional payments.

*Background*

THE DEPARTMENT OF FINANCIAL SERVICES (the "Department" or "DFS") has been conducting an inquiry into allegations of unfair claims and trade practices by authorized life insurers and fraternal benefit societies (collectively, "insurers") based on concerns that insurers may not be adopting and implementing proper standards for investigating claims and locating beneficiaries with respect to death benefits under life insurance policies, annuity contracts, and retained asset accounts. ***In particular, there may be instances where a death has occurred and no claim has been filed, but premiums continue to be deducted from the account value or cash value until the policy lapses.*** In some instances beneficiaries may be unaware that they have been named as a beneficiary and not realize that they need to file a claim. In the context of retained asset accounts, funds may simply remain dormant after the death of the accountholder because the beneficiary, if a beneficiary was designated at all, may not be aware of the account. In all of these instances, a valid death benefit is either not paid or the payment is delayed.

Recently, the Department issued a letter pursuant to Section 308 of the New York Insurance Law ("308 letter") advising all insurers that a cross-check of all life insurance policies, annuity contracts, and retained asset accounts on their administration data files, including group policies for which an insurer maintains detailed insured records, should be performed with the latest updated version of the U. S. Social Security Administration's Death Master File ("SSA-DMF") – or another database or service that is at least as comprehensive as the SSA-DMF – to identify any death benefit payments that may be due under life insurance policies, annuity contracts, or retained asset accounts as a result of the death of an insured or contract or account holder. The Department supplemented the 308 letter with guidance to the life industry in New York issued August 8, 2011, September 28, 2011, and October 14, 2011.

### *Findings to Date*

BASED ON THE DEPARTMENT'S INVESTIGATION, including responses to the Department's 308 requests, *it appears that some insurers have utilized the SSA-DMF to stop annuity payments once a contract holder dies, but have not used the SSA-DMF to determine if any death benefit payments are due under life insurance policies, annuity contracts, or retained asset accounts.*

In addition, technology has now advanced to the point that all insurers can and should be adopting standard procedures to cross-check life insurance policies, annuity contracts and retained asset accounts on their administration data files with SSA-DMF, or another database or service that is at least as comprehensive as SSA-DMF, on a regular basis as a supplement to the historical death claim reporting processes. *Many life insurers already purchase SSA-DMF or subscribe to a service that utilizes SSA-DMF for some purposes (e.g., terminating annuity payments).* Best practices require that insurers that do not currently purchase SSA-DMF or subscribe to a service that utilizes such do so going forward, and that all insurers should be utilizing SSA-DMF or a database that is at least as comprehensive, to determine if any death benefit payments are due as a result of unreported claims.

DFS received first-stage reports from insurers in response to the inquiries on October 31, 2011. Subsequent progress reports will be forthcoming, with a final report due March 31, 2012. This Interim Report is based upon the information the Department received in the first-stage reporting (7 insurers, 2 life insurers and 5 fraternals have not yet submitted responses; DFS is pursuing those insurers for follow up).

Based on what has been reported to the Department thus far, recipients of the inquiry letters have paid approximately $52.6 million to beneficiaries since the start of DFS's investigation, including approximately $16.9 million paid to New York payees.

The earliest year of death for which a benefit payment has been made thus far is 1970, and the largest benefit payment made thus far is $673,485. Average payments have ranged from $2,786 to $36,363, depending on the type of business. See the table below for further details set forth by type of business:

| Type of Business | Earliest Date of Death | Largest Amount Paid | Average Amount Paid |
|---|---|---|---|
| Individual Life | 1970 | $673,485 | $6,994 |
| Group Life | 1989 | $199,827 | $2,786 |
| Individual Annuity | 1994 | $365,264 | $36,363 |
| Group Annuity | 1988 | $167,821 | $6,978 |
| Retained Assets | 2005 | $137,690 | $17,836 |

\* \* \*

Overall, insurers report that they have cross-checked approximately 79.22 million policy records against the SSA-DMF. This has resulted in approximately 2.68 million initial matches. Many initial matches have been eliminated for reasons such as: policies not in force at time of death, match is not with the same person, and claim already submitted. *Insurers are still in the process of validating and/or investigating approximately 950,000 initial matches. Approximately 7,934 payments have already been made to individuals totaling approximately $52.6 million, including about 1,209 payments made to New York payees totaling approximately $16.9 million.* Insurers have also initiated claims processing for approximately 27,889 other matches.

Insurers also report that they have scheduled for escheatment or escheated approximately $4.3 million to various states. For any deaths that are confirmed where the insurer cannot locate the beneficiary, insurers are expected to escheat the death benefits to the appropriate state, within the state's statutorily-prescribed timeframe.

With regard to specific practices involving utilization of the SSA-DMF, there are a small number of insurers that have been performing regular SSA-DMF cross-checks for a number of years including Massachusetts Mutual Life Insurance Company and Prudential Insurance Company of America. Some other insurers have more recently adopted regular cross-check procedures, including Metropolitan Life Insurance Company. However, many insurers have not made regular use of SSA-DMF cross-checks to pay unreported insurance benefits. Among the insurers that currently do regular cross-checks, there also appears to be a move toward doing the cross-checks more frequently – quarterly and even monthly.

81.     The magnitude and duration of the Individual Defendants' misconduct, which dates back nearly thirty years, indicates a knowing or reckless culpability. Moreover, while numerous jurisdictions were investigating the wrongdoing and subpoenaing the Company for records, the Individual Defendants continued their improper policies and made improper statements to conceal their improper activity.

## REASONS THE STATEMENTS WERE IMPROPER

82.     The statements referenced above were each improper when made because they failed to disclose and misrepresented material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing. These material facts included over thirty investigations into the Company's improper business practices. Since as early as July 2010, the Company was under investigation for their practices, but waited over a year to finally disclose how serious the investigations were and made improper statements to conceal the damage the investigations would cause. On July 29, 2010, the New York Attorney General announced that his office had launched a major fraud investigation into the life insurance industry for practices related to the use of retained asset accounts as a settlement option for death benefits and that subpoenas requesting comprehensive data related to retained asset accounts had been served on MetLife and other insurance carriers.

83.     Then, on April 25, 2011, the California Insurance Commissioner issued a press release announcing an investigation into MetLife's practices regarding the withholding of death benefits, even after having notice that a policyholder had died:

Insurance Commissioner Jones, Controller Chiang Launch Investigation Into Death Payment Practices

* * *

Insurance Commissioner Dave Jones and State Controller John Chiang today announced the issuance of a subpoena and joint investigative hearing into the practices of Metropolitan Life Insurance Company (MLIC), also known as MetLife. The hearing will focus on MetLife's practices regarding payment of benefits under life insurance policies after MetLife learns of an insured's death -

-48-

either to the beneficiaries or, if they cannot be located for three years or more, to the State's Unclaimed Property program.  MetLife learned of the deaths of insureds through a database prepared by the Social Security Administration called "Death Master," which lists all Americans who die.

*The Commissioner and the Controller are responding to preliminary findings from an audit the Controller launched in 2008, indicating that for two decades, MetLife failed to pay life insurance policy benefits to named beneficiaries or the State even after learning that an insured had died.*  The company has a huge number of so-called Industrial Policies, valued at an estimated $1.2 billion, which were primarily sold in the 1940s and 1950s to working-class people.  The payments, which were collected weekly, typically were higher than the final death benefit.  The Controller's unclaimed property audit indicates that MetLife did not take steps to determine whether policy owners of dormant accounts are still alive, and if not, pay the beneficiaries, or the State if they cannot be located.

*Simultaneously, the preliminary findings show, when MetLife knew that an owner of an annuity contract - which generates income for the policy owner at the time the annuity matures - had died, or the annuity had matured, the company did not contact the policy holder or beneficiary, even though it subscribed to the "Death Master" database.*  Furthermore, MetLife continued making premium payments from the policy holder's account until the cash reserves were used up, and then cancelled the contract.

"The thrust of this hearing is to determine whether MetLife, one of the largest life insurers and issuers of annuities in the United States, engaged· in unfair practices regarding the payment of life insurance claims to beneficiaries," Commissioner Jones said.

"California families buy insurance to provide for their retirement security and the financial security of their families when they die," Controller Chiang said. "The benefits should be paid to the policy beneficiaries or to the State to return to the rightful owners."

The hearing will be held in Sacramento on Monday, May 23, 2011, from 9:30 a.m. to 11:30 a.m.

84.     Despite the April 25, 2011 press release from the California Insurance Commissioner detailing the wrongdoing, the Individual Defendants continued to cause the Company to make improper statements on May 4, 2011 and May 10, 2011. Then, on May 19, 2011, the Florida Office of Insurance Regulation conducted a public hearing concerning MetLife's death benefit payment practices. Katz, MetLife's Executive Vice President, and Cassandra, MetLife's Senior Vice President, testified at the hearing on behalf of the Company. During the hearing, Katz admitted that MetLife began using the DMF "soon after [it] became commercially available" in the late 1980s, once a month, to match an indication of death to suspend annuity payments. Katz also admitted, however, that MetLife did not use the SSA-DMF for life insurance policies on a more frequent basis. As a result of the hearing, Florida Commissioner Kevin McCarty determined that life insurers may owe beneficiaries approximately $1 billion in unclaimed assets throughout the United States.

85.     On May 23, 2011, California Insurance Commissioner Dave Jones ("Jones") and State Controller John Chiang ("Chiang") issued a subpoena to MetLife to investigate the Company's death payment practices. Prior to the hearing, MetLife spokesperson Christopher Breslin reportedly stated that "*[o]ur priority is to pay insurance benefits to those who are entitled to them.... When beneficiaries cannot be located, we turn those benefits over to the state.*" The California Insurance Commissioner and State Controller issued a press release on the same day that stated the following:

Insurance Commissioner Jones Announces Examinations Of Life Insurers In California Over Alleged Non-Payment of Benefits

Insurance Commissioner Dave Jones announced today the initiation of Market conduction examinations of the ten largest life insurance companies doing business in California. The announcement came during a joint investigative hearing with Controller John Chiang into the payment practices of Metropolitan Life Insurance Company, also known as MetLife. The market conduct examinations, as did the hearing, will focus on whether life insurers failed to pay life insurance policy benefits to named beneficiaries or the State even after learning that an insured person had died.

- 50 -

The ten insurers subject to the market conduct examinations are: Metropolitan Life Insurance Company (MetLife), Hancock Insurance, Prudential Insurance, Nationwide Insurance, The Hartford, Sun Life Financial, New York Life Insurance Company, The Lincoln National Life Insurance Company, Aegon Group, which includes Transamerica, and Pacific Life Insurance Company. Commissioner Jones is conducting the investigation jointly with State Controller John Chiang.

"The goal of these examinations is to determine whether the insurance industry has engaged in unfair practices in the payment of death benefits under life insurance policies and annuities," Commissioner Jones said. "Insurance regulators and state controllers across the country are examining life insurance companies to understand whether they are using information they have that indicates a policyholder has died and whether they are paying out benefits appropriately. Initial information from publicly available sources suggests some troubling practices in this area, and we intend to get to the bottom of appears to be a very troubling trend."

*Based on preliminary findings, life insurers receive detailed information about the death of their policyholders from a database prepared by the Social Security Administration called "Death Master."* Insurers use Death Master for a variety of purposes. *However, a critical issue is whether some insurers use Death Master to cut off payments on annuities when an annuity owner dies but do not use that information to identify life insurance policyholders who died and pay their beneficiaries.*

**Market Conduction Examinations**

The California Department of Insurance conducts examinations of insurance companies to be sure that the companies are in compliance with the California Insurance Code (CIC) and the California Code of Regulations with respect to rating, underwriting and claim practices. These are called market conduct examinations. Exams can be scheduled based on consumer complaint activity, special requests, or at regular intervals.

Market conduct examination reports document the findings of our examiners. The reports identify the size of the policy sample or claim sample that was reviewed by the examiners and indicate any alleged violations of the law discovered during the exam. The reports also summarize actions taken by the insurers to correct the alleged non-compliant practices. The public reports of examination available here contain alleged violations of CIC Section 790.03, Prohibited Acts, and the Fair Claims Settlement Practices regulations. In some cases, the examinations serve as the basis for a formal legal enforcement action against an insurer.

86.    After the hearing, California Commissioner Jones and Controller Chiang determined that "life insurers with access to the Social Security Administration's 'Death Master File' are not using information about deaths to trigger payments to life insurance beneficiaries."

California Commissioner Jones also discovered that MetLife was purposely withholding life insurance payments and keeping the money to earn interest for as long as possible in retained asset accounts. While insurance companies are required to either make beneficiary payments or to send the unclaimed money to their state's unclaimed property fund, MetLife failed to do either. In fact, California Commissioner Jones discovered that MetLife had failed to pay money to beneficiaries *for two decades*, while also failing to submit money to California's abandoned property fund.

87.    On July 5, 2011, *Reuters* reported that the New York Attorney General had issued subpoenas to nine life insurance companies, including MetLife, specifically demanding information regarding their procedures for identifying beneficiaries of life insurance policies and compliance with relevant state escheatment laws:

> NY subpoenas nine life insurance companies
>
> New York's top legal officer has sent subpoenas to nine leading life insurers seeking information about their practices in identifying and paying out policies for deceased customers, according to a person familiar with the matter.
>
> New York Attorney General Eric Schneiderman last month sent subpoenas to units of AXA SA, Genworth Financial Inc, Guardian Life Insurance Co of America, Manulife Financial Corp, Massachusetts Mutual Life Insurance Co, MetLife Inc, New York Life Insurance Co, Prudential Financial Inc, and TIAA-CREF, the source said, according to a person familiar with the matter.
>
> This person requested anonymity because the probe is not public.
>
> The Wall Street Journal first reported the life insurance investigation.
>
> *The investigation is looking into whether insurance companies have done enough to identify beneficiaries of life insurance policies once a customer dies, the source told Reuters on Tuesday.*
>
> Schneiderman's office is also seeking information about unclaimed policy proceeds that are supposed to be turned over to the state.

88.    The statements referenced above were also each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

- 52 -

     (a)    the Company had not properly or adequately reserved for the payment of benefits to policyholders' beneficiaries;

     (b)    the Company's historical processes, policies, and procedures were inadequate to identify current liabilities related to policyholders which had died but whose beneficiary claims had not yet been made;

     (c)    the assurances that the allegations regarding the Company's retained asset accounts were without merit;

     (d)    the Company's financial results and guidance for its operating earnings were improper; and

     (e)    the Company failed to reserve for losses it already incurred.

## DAMAGES TO METLIFE

89.   As a result of the Individual Defendants' improprieties, MetLife disseminated improper, public statements that assured the public that the allegations regarding the Company's retained asset accounts were without merit.   These improper statements have devastated MetLife's credibility as reflected by the Company's almost $17.4 billion, or 36.4%, market capitalization loss in only eight months.

90.   Further, as a direct and proximate result of the Individual Defendants' actions, MetLife has expended, and will continue to expend, significant sums of money.   Such expenditures include, but are not limited to:

     (a)    costs incurred from investigating and responding to the thirty jurisdictions that are auditing MetLife, which include responding to subpoenas from regulatory inquiries;

     (b)    costs incurred from any potential settlement with the thirty jurisdictions investigating the Company;

     (c)    costs incurred from payments to beneficiaries and associated administrative penalties, and interest;

(d)     costs incurred from additional escheatment of funds deemed abandoned under state laws and associated administrative penalties, and interest;

(e)     costs incurred in initiating an internal review and/or investigation;

(f)     costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws; and

(g)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to MetLife.

91.     Moreover, these actions have irreparably damaged MetLife's corporate image and goodwill. For at least the foreseeable future, MetLife will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that MetLife's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

92.     Plaintiffs bring this action derivatively in the right and for the benefit of MetLife to redress injuries suffered, and to be suffered, by MetLife as a direct result of breaches of fiduciary duties, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. MetLife is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

93.     Plaintiffs will adequately and fairly represent the interests of MetLife in enforcing and prosecuting its rights.

94.     Plaintiffs were shareholders of MetLife at the time of the wrongdoing complained of, have continuously been shareholders since that time, and are current MetLife shareholders.

95.     The current Board of MetLife consists of the following thirteen individuals: defendants Kandarian, Grisé, Price, Keane, Sicchitano, Burwell, Kilts, Hubbard, Satcher, Castro-

Wright, Wang, Kinney, and Kelly. Plaintiffs have not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

## Demand Is Excused Because the Director Defendants' Conduct Is Not a Valid Exercise of Business Judgment

96.     Defendants Kandarian, Grisé, Price, Keane, Sicchitano, Burwell, Kilts, Hubbard, Satcher, Castro-Wright, Wang, Kinney, and Kelly participated or acquiesced in the misconduct and egregious circumstances complained of herein, which exposed the Company to significant harm and potential liability. The magnitude and duration of the Board's wrongdoing and failures shows it is incapable of independently considering a demand. Such participation or acquiescence involved participating, planning, and authorizing the acts complained of herein. The alleged acts of wrongdoing are in violation of relevant laws, rules, and regulations, and have subjected (and continue to subject) MetLife to significant and unreasonable risks and harm without any commensurate or appropriate reward to the Company.

97.     As the ultimate decision-making body of the Company, the Board affirmatively adopted, implemented, and condoned a business strategy based on deliberate and widespread improper activities. Causing the Company to engage in the improper tactics that threaten its survival is not a protected business decision and such conduct can in no way be considered a valid exercise of business judgment. Accordingly, demand on the Board is excused.

## Demand Is Excused Because Defendants Kandarian, Grisé, Price, Keane, Sicchitano, Burwell, Kilts, Hubbard, Satcher, Castro-Wright, Wang, Kinney, and Kelly Face a Substantial Likelihood of Liability for Their Misconduct

98.     The magnitude and duration of the Board's misconduct, which dates back nearly thirty years, indicates a knowing or reckless culpability. The entire Board is subject to liability for its wrongdoing as alleged herein.

99.     Defendants Kandarian, Grisé, Price, Keane, Sicchitano, Burwell, Kilts, Hubbard, Satcher, Castro-Wright, Wang, Kinney, and Kelly are interested because they face a substantial

- 55 -

likelihood of liability for knowingly choosing not to act to stop and prevent further violations of state law in the face of numerous and overwhelming facts alerting them to what was occurring at the Company. These facts include:

(a)    A major fraud investigation announced by the New York Attorney General into the Company for practices related to the use of retained asset accounts as a settlement option for death benefits;

(b)    Subpoenas related to the wrongdoing from the New York Attorney General;

(c)    The California Insurance Commissioner's investigation into the Company's practices of withholding death benefits, even after having notice that a policy holder had died. In particular, the California Insurance Commission stated that "[t]he Commissioner and the Controller are responding to preliminary findings from an audit the Controller launched in 2008, indicating that for two decades, MetLife failed to pay life insurance policy benefits to named beneficiaries or the State even after learning that an insured had died." The California Insurance Commissioner also found that when MetLife knew when an owner of an annuity contract had died, or the annuity had matured, the Company *did not* contact the policy holder or beneficiary, even though it subscribed to the SSA-DMF;

(d)    The Florida Office of Insurance Regulation investigation and hearing concerning MetLife's death benefit payment practices. The Florida Insurance Commissioner determined that life insurers, including MetLife may owe beneficiaries approximately $1 billion in unclaimed assets throughout the United States;

(e)    Subpoenas from a joint investigation by the California Insurance Commissioner and State Controller related to the Company's death benefit payment practices; and

(f)    At least thirty investigations by different states for violations related to the

Company's death benefit payment practices and failure to escheat unclaimed funds to the states. Despite these facts Kandarian, Grisé, Price, Keane, Sicchitano, Burwell, Kilts, Hubbard, Satcher, Castro-Wright, Wang, Kinney, and Kelly consciously failed to act to stop and prevent further violations of applicable laws explained herein. Therefore, a reasonable doubt is raised as to whether Kandarian, Grisé, Price, Keane, Sicchitano, Burwell, Kilts, Hubbard, Satcher, Castro-Wright, Wang, Kinney, and Kelly can impartially and disinterestedly consider a demand.

100.    As alleged above, defendants Kandarian, Grisé, Price, Keane, Sicchitano, Burwell, Kilts, Hubbard, Satcher, Castro-Wright, Wang, Kinney, and Kelly breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding the merits of the accusations against the Company.

101.    Defendants Grisé, Keane, Kelly, Kinney, Price, and Sicchitano as members of the Audit Committee, reviewed and approved the improper statements. The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements. Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's liability from multiple investigations into the Company's use of the SSA-DMF. Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements. Moreover, the Audit Committee Defendants were responsible for reviewing and approving the adequacy of the Company's internal controls over financial reporting, which were utterly lacking. Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

102.    Defendants Burwell, Castro-Wright, Grisé, Hubbard, Kilts, Kinney, Satcher,

Henrikson, Sicchitano, and Wang, as members of the Investment Committee, were charged with reviewing and approving the Company's "compliance with insurance laws and regulations that govern insurance company investments." Thus, the Investment Committee Defendants were responsible for knowingly or recklessly causing or allowing the Company to violate applicable laws, rules, and regulations. Accordingly, the Investment Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, the Investment Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

103.    Defendants Burwell, Castro-Wright, Hubbard, Kelly, Kilts, Kinney, Sicchitano, and Wang, as members of the Finance and Risk Policy Committee, assessed and managed the Company's material risks. The Finance and Risk Policy Committee's Charter provides that it is also to review and approve "the Company's policies, practices and procedures regarding risk assessment, management, and mitigation." Thus, the Finance and Risk Policy Committee Defendants were responsible for knowingly or recklessly allowing the material risks of not paying beneficiaries life insurance payments when due and not instituting adequate internal controls to monitor the Company's risks, including obligations owed to the states due to escheatment. Despite their knowledge or reckless disregard, the Finance and Risk Policy Committee Defendants caused these material risks. Accordingly, the Finance and Risk Policy Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein. Thus, the Finance and Risk Policy Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

104.    Any suit by the current directors of MetLife to remedy these wrongs would expose defendant Kandarian to liability for violations of the federal securities laws in the pending consolidated securities class action, and would result in civil actions being filed against

one or more of the other Individual Defendants. The securities class action alleges violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934. If the Board elects for the Company to press forward with its right of action against Kandarian in this action, then MetLife's efforts would compromise its defense of the securities class action. Accordingly, demand on the Board is excused.

105.    The principal professional occupation of defendant Kandarian is his employment with MetLife, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above. Accordingly, Kandarian lacks independence from defendants Grisé, Price, Keane, Sicchitano, Burwell, Kilts. Hubbard, Satcher, Castro-Wright, Wang, Kinney, and Kelly due to his interest in maintaining his executive positions at MetLife. This lack of independence renders Kandarian incapable of impartially considering a demand to commence and vigorously prosecute this action. MetLife paid Kandarian the following compensation:

| Fiscal Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| 2010 | $625,000 | $870,480 | $896,000 | $1,500,000 | $197,136 | $69,000 | $4,157,616 |
| 2009 | $583,333 | $1,987,200 | $1,519,200 | $1,100,000 | $173,487 | $77,100 | $5,440,320 |
| 2008 | $631,250 | $840,275 | $771,255 | $1,000,000 | $213,112 | $93,297 | $3,449,189 |

Accordingly, Kandarian is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation. Demand is futile as to Kandarian.

106.    Moreover, the acts complained of constitute violations of the fiduciary duties owed by MetLife's officers and directors and these acts are incapable of ratification.

107.    Each of the Director Defendants of MetLife authorized and/or permitted the improper statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the improper statements, and are principal beneficiaries of the wrongdoing alleged herein and, thus, could not fairly and fully prosecute such a suit even if such suit was instituted by them.

108.    MetLife has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for MetLife any part of the damages MetLife suffered and will suffer thereby.

109.    If MetLife's current and past officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duties alleged in this Complaint by directors and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of MetLife. However, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by MetLife against these defendants, known as the "insured versus insured exclusion." As a result, if these directors were to cause MetLife to sue themselves or certain of the officers of MetLife, there would be no directors and officers' insurance protection and, thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no directors and officers' liability insurance, then the current directors will not cause MetLife to sue the defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

110.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiffs, the current Board has failed and refused to seek to recover for MetLife for any of the wrongdoing alleged by plaintiffs herein.

111.    Plaintiffs have not made any demand on the other shareholders of MetLife to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    MetLife is a publicly held company with over one billion shares outstanding and thousands of shareholders;

(b)    making demand on such a number of shareholders would be impossible for plaintiffs who have no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)    making demand on all shareholders would force plaintiffs to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duties

112.    Plaintiffs incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

113.    The Individual Defendants owed and owe MetLife fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe MetLife the highest obligation of good faith, fair dealing, loyalty, and due care.

114.    The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty. More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within MetLife, and/or consciously failing to prevent to Company from engaging in the unlawful acts complained of herein.

115.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent when they made improper statements concerning the Company's: (i) current liabilities; (ii) the merits of the investigations by state authorities into its retained asset accounts; and (iii) the Company's operating earnings. Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

116.    The Director Defendants, as directors of the Company, owed MetLife the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the improper activity concerning the Company's policies and procedures for using SSA-DMF to check whether it owed beneficiaries under its obligations and liabilities.    The Director Defendants also breached their fiduciary duties by making improper statements concerning the Company's: (i) current liabilities; (ii) the merits of the investigations by state authorities into its retained asset accounts; and (iii) the Company's operating earnings.  Accordingly, the Director Defendants breached their duty of loyalty to the Company.

117.    The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

118.    The Investment Committee Defendants breached their fiduciary duty of loyalty by knowingly or recklessly causing or allowing the Company to violate applicable laws, rules, and regulations during their tenure on the Investment Committee.  The Investment Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to

appropriately review and comply with applicable insurance laws, rules, and regulations as required by the Investment Committee Charter in effect at the time.

119.    The Finance and Risk Policy Defendants breached their fiduciary duty of loyalty by knowingly or recklessly allowing the material risks of not paying beneficiaries life insurance payments when due and not instituting adequate internal controls to monitor the Company's risks, including obligations owed to the states due to escheatment. The Finance and Risk Policy Defendants completely and utterly failed in fulfilling their fiduciary duty, as required by the Finance and Risk Policy Committee Charter in effect at the time.

120.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, MetLife has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

121.    Plaintiffs, on behalf of MetLife, have no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

122.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

123.    As a result of the improper conduct related to failing to have a system in place to check the SSA-DMF in order to pay out death benefits, the Individual Defendants have caused MetLife to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

124.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

125.    Plaintiffs, on behalf of MetLife, have no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

126.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

127.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of MetLife. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching their fiduciary duties owed to MetLife.

128.    Plaintiffs, as shareholders and representatives of MetLife, seek restitution from these defendants, and each of them, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

129.    Plaintiffs, on behalf of MetLife, have no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of MetLife, demand judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Directing MetLife to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect MetLife and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

- 64 -

1.     a provision to implement a committee that oversees the Company's policies and practices related to the SSA-DMF and complies with all applicable state and federal regulations for paying death benefits and paying benefits to the state;

2.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

3.     a provision to permit the shareholders of MetLife to nominate at least three candidates for election to the Board;

4.     a proposal to strengthen the Company's controls over financial reporting; and

5.     a proposal to strengthen MetLife's oversight of its disclosure procedures;

C.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiffs on behalf of MetLife have an effective remedy;

D.     Awarding to MetLife restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.     Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: April 19, 2012

LAW OFFICES OF THOMAS G. AMON

THOMAS G. AMON

- 65 -

250 West 57th Street, Suite 1316
New York, NY 10107
Telephone: (212) 810-2430
Facsimile: (212) 810-2427
E-mail: tamon@amonlaw.com

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
KEVIN A. SEELY
JAY N. RAZZOUK
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
Email: brobbins@robbinsumeda.com
        kseely@robbinsumeda.com
        jrazzouk@robbinsumeda.com

LAW OFFICES OF ALFRED G.
  YATES, JR., P.C.
ALFRED G. YATES JR.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA  15219
Telephone: (412) 391-5164
Facsimile:  (412) 471-1033
Email: yateslaw@aol.com

Attorneys for Plaintiffs

723782

VERIFICATION

I, CONGETTA J. MARTINO, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duties, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _March 23, 2012_

_Congetta J Martino_
CONGETTA J. MARTINO

## VERIFICATION

I, PHYLLIS D. RICCIARDI, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duties, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _3/22/12_

_Phyllis D. Ricciardi_

PHYLLIS D. RICCIARDI

## VERIFICATION

I, PHILIP E. RICCIARDI, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duties, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated: _March 30, 2012_

_Philip E. Ricciardi_
PHILIP E. RICCIARDI